RAMÓN MONTANER, en su carácter de ADMINISTRADOR DEL FONDO DEL SEGURO DEL ESTADO, recurrente, *v.* LA COMISIÓN INDUSTRIAL DE PUERTO RICO, compuesta por los Sres. MANUEL LEÓN PARRA, Presidente, y F. PAZ GRANELA y JUAN M. HERRERO, Comisionados Asociados, recurrida, y JOSEFINA FUENTEFRÍA ET ALS., peticionarias ante la Comisión.

Núm. 155.—*Sometido:* Marzo 6, 1939. *Resuelto:* Mayo 9, 1939.

*Hon. Procurador General B. Fernández García, Emilio de Aldrey, Procurador General Auxiliar y L. Negrón Fernández,* abogado éste del Fondo del Estado, abogados del recurrente; *M. León Parra,* abogado de la Comisión recurrida; *Virgilio Brunet y F. Rebollo López,* abogados de las peticionarias ante la Comisión.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

El 20 de julio de 1935 trabajaba el obrero Miguel Parque descargando carbón de una bodega del vapor Comerío, de la N.Y. & P.R. S/S Co., surto entonces en el puerto de Fajardo. Consistía su trabajo en traspalar el carbón de la estiba en la bodega a un "tobo" (cubo grande). Empezó su trabajo a las siete de la mañana y como a las doce del día lo suspendió para almorzar. Reanudó el trabajo a la una de la tarde, y como a las 2:15 más o menos, sufrió un síncope o colapso, a consecuencia del cual falleció unos instantes después.

Conforme aparece de la prueba, la bodega donde trabajaba Parque es la más calurosa del vapor. No tiene más ventilación que un pequeño hueco que los obreros denominan "media jacha" y el sitio por donde pasa el "montacarga" (winch). El resto de ella está cerrado. El calor es allí tan intenso que frecuentemente los obreros se ven precisados a despojarse de su ropa de la cintura para arriba, empeorando sus condiciones de trabajo el tenerse que cubrir la boca y la nariz con un pañuelo para protegerse del polvo que levanta el carbón, obligándoles a veces el calor sofocante a salir sobre la cubierta en busca de aire fresco.

Eran éstas las condiciones en que según la prueba trabajaba el obrero Parque en los momentos en que le sorprendió la muerte. Describiendo el suceso, sus compañeros de trabajo declaran que después de haber recesado de 12 a 1 de la tarde para almorzar y haber estado trabajando continuamente desde las siete de la mañana, como a los tres cuartos de hora de reanudar su trabajo de la tarde, al introducir la pala para coger carbón, Parque se desplomó al suelo. Su rostro estaba ennegrecido, tenía la lengua por fuera, sudaba profusamente y hacía esfuerzos por respirar. Al verlo así, sus compañeros lo sacaron de la bodega, no obstante lo cual falleció inmediatamente después. Conviene agregar que hacía años que Parque se dedicaba a este tra-

bajo, así como a cargar sacos de 300 libras cuando no trabajaba en el carbón.

El Administrador del Fondo del Estado dictó resolución el 11 de enero de 1936, por la que declaró que la muerte del obrero no fué causada por un accidente del trabajo comprendido dentro de las disposiciones de la Ley núm. 45 de 18 de abril de 1935 (Leyes de ese año, (1) pág. 251), y consecuentemente denegó la reclamación.

Recurrieron la viuda e hijas ilegítimas del fenecido, las peticionarias, para ante la Comisión Industrial, y ésta, después de recibir y oír la prueba, tanto del Administrador como de las peticionarias, por los méritos de la evidencia revocó la resolución del Administrador y resolvió que la muerte del obrero Parque fué causada por un accidente del trabajo y que las personas que dependían de él para su subsistencia eran las peticionarias, o sea su viuda Josefina Fuentefría, y las hijas ilegítimas de aquél, menores de edad, llamadas Manuela Josefina González y Angela Amaro, con derecho a recibir una indemnización de acuerdo con lo prescrito en el párrafo 16 del artículo 3 de la Ley núm. 45 de 18 de abril de 1935 y las reglas establecidas.

No estando conforme el Administrador con la resolución de la Comisión Industrial, interpuso este recurso de revisión en el que señala dos errores que alega cometió la Comisión Industrial, a saber:

"*Primero:* La conclusión de la Comisión Industrial sobre la causa de la muerte del obrero Miguel Parque no está sostenida por la prueba médica en este caso,

"(*a*) Por cuanto el informe de Medicina Tropical no establece causa alguna, indicando tan solo como mera posibilidad el que pudiera haber sido *healstroke* la causa, y

"(*b*) Por cuanto la declaración del Dr. Luis C. Boneta, expresando que la causa segura de la muerte fué *heatstroke,* es insuficiente para servir de base a la resolución de la Comisión, toda vez que es una mera conclusión sin base alguna que la sostenga.

"*Segundo:* La Comisión cometió error al resolver que la muerte de dicho obrero provino de un accidente del trabajo, por cuanto una

muerte ocasionada por *heatstroke* no es una muerte accidental tal como lo contempla el artículo 2 de la Ley de Compensaciones por Accidentes del Trabajo.''

■■ El artículo 11 de la Ley núm. 45 antes citada, al conferir jurisdicción a este tribunal para revisar las resoluciones de la Comisión Industrial, expresamente limita el recurso de revisión a cuestiones de derecho solamente. Esta limitación, sin embargo, no significa que la comisión pueda actuar arbitrariamente estimando probado un hecho esencial sin que exista evidencia legal y competente que sostenga su conclusión, pues si así interpretásemos el precepto legal, se infringiría la cláusula constitucional sobre el debido proceso de ley.

En el caso de *Jillson* v. *Ross*, (1915) R.I., 94 Atl. 717, se sostuvo por la Corte Suprema de Rhode Island que una conclusión de hecho enteramente desprovista de evidencia que la sostenga, constituye un error de derecho y debe ser revisada y anulada por la corte de apelación. En el de *Employers' Assurance Corporation* v. *Industrial Acci. Comm.*, (1915) Cal., 151 P. 423, se resolvió que una indemnización basada en testimonio de referencia no puede sostenerse. Y en el de *Rec.* v. *Whittlesberger*, (1914) 181 Mich. 463, 148 N.W. 247, se sostuvo que para que los hechos probados por la ''Industrial Accident Board'' se estimen concluyentes, la conclusión de hecho debe estar basada en evidencia legal competente, no en mera suposición, adivinación o conjetura, ni en rumor o evidencia incompetente. Véanse las extensas monografías sobre la materia en L.R.A. 1916–A, págs. 23, 266, y L.R.A. 1917–D, 80, 188, y casos citados.

Sentada esta premisa, veamos si existe o no prueba legal competente que sostenga la conclusión a que llegó la Comisión Industrial al efecto de que el obrero Parque falleció a consecuencia de tabardillo (*heatstroke*).

En primer término tenemos el testimonio de los compañeros del fenecido que describen las condiciones en que aquél trabajaba, así como los síntomas externos que fácilmente

pudieron ellos apreciar, que precedieron a su muerte. Luego tenemos el informe de la Escuela de Medicina Tropical, que aunque llega a la conclusión que la causa de la muerte no es evidente del examen practicado en las vísceras, sin embargo advierte la posibilidad de que aquélla haya sido causada por *heatstroke*. Finalmente tenemos el informe pericial del Dr. Luis C. Boneta que no está basado en conjeturas como alega el recurrente, sino en la evidencia recibida por la comisión y en el informe de la Escuela de Medicina Tropical.

Es verdad que el informe de la Escuela de Medicina Tropical erróneamente parte de la base de que el fenecido trabajaba en un cuarto de calderas (*boiler room*) pero es también cierto que trabajaba en la bodega que ya conocemos, cuya temperatura y condiciones de ventilación la equiparan a un cuarto de calderas.

De la resolución recurrida tomamos los siguientes párrafos en que se reseña el informe del Dr. Boneta:

"Declaró el Dr. Boneta que el informe de la Escuela de Medicina Tropical dice que hubo congestión del pulmón, congestión del cerebro, el hígado crecido, todos los cuales son síntomas corrientes en los trópicos, que causan la muerte repentinamente; que hay quien padece todos estos síntomas sin saberlo y nadie lo advierte hasta que un día se muere; que lo más significativo es la congestión del pulmón y congestión cerebral; que según han desfilado los testigos han ido declarando que Miguel Parque almorzó como de doce a doce y media, y casi inmediatamente, a la una, reanudó su trabajo en un cuarto donde existía una temperatura muy alta, y por lo cual había mucho calor, con el estómago cargado y acabado de almorzar, cayendo muerto después de haber sudado mucho; que ese historial y los síntomas son típicos de un *heatstroke;* que es lo característico, aun sin que se considere la nota de la Escuela de Medicina Tropical; que de no haber visto dicha nota hubiese opinado exactamente igual después de oír la sintomatología previa y el historial del caso; que un prolongado esfuerzo del cuerpo en una temperatura alta puede producir una asfixia, es decir, una parálisis motora, donde se paraliza especialmente la respiración; que casi siempre sucede cuando se está en un cuarto donde hay poco oxígeno; que la posibilidad de que el obrero en

cuestión tuviera una lesión en el miocardio se elimina al conocer que Miguel Parque trabajaba también cargando sacos de 315 libras. El abogado del asegurador suplica que no se tome en consideración alguna lo expresado por el Dr. Luis C. Boneta, por cuanto que ha declarado sobre hechos erróneos.

"Sigue declarando el Dr. Luis C. Boneta a preguntas del abogado de la parte peticionaria, que una persona que padece del corazón no puede cargar sacos de trescientas quince libras, pues le causaría la muerte; que de haber tenido un corazón cardíaco el obrero en cuestión al hacer una fuerza como para cargar sacos de 315 libras se hubiera muerto; que las lesiones del músculo del corazón pueden ser crónicas; que de haber tenido el lesionado una lesión crónica en la válvula mitral hubiera muerto al levantar sacos de trescientas quince libras; que la congestión cerebral, la congestión pulmonar con edema, todo es indicativo de que hubo una asfixia; que por asfixia puede morir el individuo instantáneamente, o tardar algunos minutos; que las muertes del corazón son instantáneas; que a veces el paciente dura algún tiempo; que los síntomas de estas muertes se parecen mucho, pero que no hay razón alguna para que una muerte bulbar haya de dejar un edema del pulmón; que de acuerdo con los datos de la patología que da la Escuela de Medicina Tropical, congestión pulmonar con edema, congestión cerebral, indican que se trata de una asfixia; que al rendir su opinión excluye por completo la posibilidad de una muerte como consecuencia de una lesión en la válvula mitral; que la Escuela de Medicina Tropical ofrece la posibilidad de que se trata de un *heatstroke,* pero él expresa como causa segura de la muerte del obrero en este caso el *heatstroke.*"

La conclusión a que llegó la Comisión Industrial no es, como hemos visto, arbitraria ni huérfana de prueba que la sostenga. Por consiguiente no podemos alterarla sea cual fuere la conclusión a que nosotros hubiéramos llegado al apreciarla, pues no nos es dable sustituir nuestro criterio por el de la comisión designada por la ley para conocer de esta materia.

No existe, a nuestro juicio, el primero de los errores señalados.

██ Consideremos ahora el segundo.

Las leyes de compensaciones a obreros, dondequiera que existen, están inspiradas en un justo sentimiento humani-

tario y en un alto espíritu de justicia social. Se originaron a fines del siglo pasado, al convencerse el Estado de lo injusto e inhumano que resultaba echar la pérdida de los accidentes del trabajo exclusivamente sobre el obrero y sus familiares, precisamente los menos preparados económica y socialmente para sufrirla. Las defensas que de acuerdo con la ley podían entonces interponer los patronos contra las reclamaciones de los obreros, tales como la de asunción del riesgo (*assumption of risk*), la de *fellow-servant rule,* la de negligencia contribuyente y otras, y lo dilatorio que resultaba el remedio que después de vencer todas esas barreras legales podían ofrecerle los tribunales de justicia, hacían ilusorios los fallos a favor del obrero y sus familiares, pues raras veces llegaban a obtener una sentencia favorable, y cuando la obtenían, el hambre y la miseria los obligaban a venderla por una parte insignificante de su valor. Fué para remediar estos males que surgió la legislación especial sobre compensaciones a obreros y las comisiones o juntas que con distintas denominaciones han sido creadas para resolver estas reclamaciones de una manera sumaria, aunque siempre en armonía con la cláusula constitucional sobre el debido procedimiento de ley.

Véase el artículo del Profesor Francis H. Bohlen, de la Escuela de Derecho de la Universidad de Pennsylvania, titulado "The Drafting of Workmen's Compensation Acts", publicado en 25 Harvard Law Review 328, y el del Dean Pound, de Harvard, titulado "The End of Law", publicado en 27 Harvard Law Review 195, donde incidentalmente, pero de manera muy instructiva, se trata esta cuestión.

La monografía anteriormente citada en L.R.A. 1916–A, 23, 215, tratando de la interpretación que debe darse a las leyes de compensaciones a obreros, dice:

"A pesar de que las leyes de compensaciones a obreros son derogatorias de la Ley Común, las cortes generalmente han sostenido que siendo una legislación de remedio, deben ser interpretadas amplia y liberalmente. Una posición contraria ha sido tomada aparentemente por la Corte de Michigan. Probablemente ningún tribunal interpreta

la ley de manera tan liberal que incluya empleados o accidentes que no están comprendidos dentro de sus disposiciones, ya expresamente o por necesaria implicación, aunque la Corte de Washington se ha manifestado en el sentido de que debe interpretarse de modo que incluya aquellos casos comprendidos en su espíritu aunque no lo estén dentro de la letra de la ley.''

El artículo 2 de la Ley núm. 45 de 1935 en lo pertinente dice:

''Art. 2.—Las disposiciones de esta Ley serán aplicables a todos los obreros y empleados que sufran lesiones o se inutilicen, o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste y como consecuencia del mismo ... ''

Sostiene el recurrente en su segundo señalamiento de error que una muerte ocasionada por *heatstroke* (tabardillo) no es una muerte accidental dentro del significado del artículo 2 de la ley, que en lo pertinente acabamos de transcribir. Arguye que para que la lesión o la muerte sea compensable, necesariamente ha de producirse como consecuencia de un accidente (*personal injury by accident*). (Alegato del recurrente, pág. 10.) Pone gran énfasis en el caso de *Bailey et al.* v. *Henry Knapp & Co.* (resuelto por la Corte Suprema de Michigan en 1938), 279 N.W. 875, donde se sostuvo que la muerte de un obrero por *heatstroke* no es una muerte por accidente indemnizable dentro de la Ley de Compensaciones a Obreros a menos que concurran circunstancias no usuales o inesperadas.

La cuestión es nueva en esta jurisdicción. Por consiguiente, estamos en condiciones de adoptar aquella interpretación que más armonice con el espíritu y propósito que inspiran la ley.

La razón que parece haber tenido la Corte Suprema de Michigan para interpretar estrictamente la Ley de Compensaciones a Obreros es la antigua máxima de hermenéutica que declara que los estatutos derogatorios de la Ley Común

730

deben ser estrictamente interpretados. *Andrejwski* v. *Wolverine Coal Co.*, (1914) 182 Mich. 298, 148 N.W. 684.

En su artículo "The Common Law in the United States", el Juez Stone, de la Corte Suprema de los Estados Unidos, reprobando la tendencia de los tribunales a restringir indebidamente la ley estatutaria, negándose a interpretarla con la misma elasticidad con que interpretan los principios legales que emanan de las decisiones judiciales (*judge-made law*), ha dicho que en la interpretación de estatutos de la índole del que nos ocupa, debe haber muy poco campo para la aplicación de esta antigua máxima tendente a destruir los claros propósitos legislativos que tienden a elevar la ciencia del Derecho al mismo nivel de progreso en que se hallan sus hermanas la Economía Política y la Sociología.    Véase 25 Harvard Law Review, págs. 4, 18.

Del propio caso de Bailey, supra, surge la vacilación del Tribunal Supremo de Michigan y se advierte que su decisión ha sido motivada más bien por la doctrina de *stare decisis* que por la aplicación de principios legales. Dice dicho tribunal:

"Aunque nos damos cuenta de la diferencia que existe en los estatutos de otras jurisdicciones, sin embargo hemos examinado las decisiones de otras cortes de última instancia referentes a *sunstroke* y a *heat prostration*. Trece de ellas sostienen que *sunstroke* y *heatstroke* son 'accidentes' dentro del significado de sus leyes de compensaciones a obreros.   (Citas.)

"Contrarios a esta doctrina son Kentucky, cuyo estatuto limita las enfermedades compensables a las causadas por accidente traumático (véase *Smith* v. *Standard Sanitary Mfg. Co.*, 211 Ky. 454, 277 S. W. 806), y quizás Maryland (*Slacum* v. *Jolley*, 153 Md. 343, 138 Atl. 244, 245). Véase, sin embargo, *State Roads Commission* v. *Reynolds*, 164 Md. 539, 165 Atl. 475.

"Empero, hemos resuelto que *heatstroke* no es una lesión que surge de un accidente."

Contra la opinión de la Corte Suprema de Michigan veamos lo que dice el Profesor Bohlen en su artículo anteriormente citado:

"Desde que se resolvió el caso de *Fenton* v. *Thorley,* todo lo que se requiere es que el daño sufrido por el demandante haya sido inesperado. Ya no se requiere que causas ajenas al demandante, que hayan contribuído a producir el daño, sean en alguna forma no usuales; basta que las causas conocidas y usuales hayan producido un resultado que en determinada ocasión no haya sido preconcebido ni esperado. El criterio para determinar si una lesión o daño es inesperado, y que si es recibido en una sola ocasión ocurre 'por accidente', es que el que lo sufra no haya calculado (*intended*) o esperado que el daño pudiera resultar como consecuencia del trabajo que realizaba en la ocasión en que lo sufrió. Lo que en realidad sea probable o aún inevitable por circunstancias ignoradas al que sufrió el daño es aún de menos importancia. La prueba es puramente subjetiva en el obrero lesionado." Artículo citado, pág. 340.

La regla de interpretación que a esta ley de justicia social ha dado la Corte Suprema de Michigan, no está en armonía con el propósito de la ley, que por ser una de remedio, inspirada en la protección del obrero y sus familiares, debe ser liberalmente interpretada para lograr los fines perseguidos por el legislador. Optamos por la interpretación liberal que se le ha dado en Inglaterra y en 13 de los tribunales de última instancia de los Estados Unidos, y siendo claro que el obrero, al realizar el trabajo donde encontró su muerte, no podía ni tenía motivo para esperar la desgracia que le ocurrió, pues era un trabajo que durante varios años venía realizando sin recibir daño alguno, tenemos que concluir que la Comisión Industrial no cometió error al resolver que Miguel Parque sufrió un accidente que le provino de un acto o función inherente a su trabajo, ocurrídole en el curso de éste y el cual fué la causa de su muerte.

*Procede, por lo expuesto, confirmar la resolución de la Comisión Industrial de Puerto Rico, de primero de agosto de 1938, objeto de este recurso de revisión.*