Narciso Torres y Rafael Vázquez, demandantes y apelados, v. Félix González Rivera, demandado y apelante.

Núm. 8846.—*Sometido:* Abril 13, 1944. *Resuelto:* Julio 13, 1944.

*Leopoldo Tormes García,* abogado del apelante; *Erasto Arjona Siaca,* abogado de los apelados.

El Juez Asociado Señor de Jesús emitió la opinión del tribunal.

Los apelados radicaron una querella en la corte municipal en reclamación de ciertas horas extras que como chóferes en la empresa de autobuses del querellado alegan haber trabajado durante el término de su empleo.

En lo que a Narciso Torres respecta, se alegó en la querella que trabajó desde el 28 de agosto de 1938 hasta el 28 de agosto de 1941, o sea mil noventa y cinco días, y que durante esos días trabajó 4,108 horas extras; que su salario era de $12.50 por semana, equivalente a $1.78 por día, el cual computado sobre la base de jornadas de ocho horas resulta a razón de veintidós centavos la hora, y por último que el valor de las 4,108 horas extras calculado a doble tipo de compensación, importa $1,807.52.

En cuanto a Rafael Vázquez, se alegó en la querella que estuvo empleado desde el 8 de mayo de 1939 hasta el 8 de mayo de 1942, o sea mil noventa y cinco días, durante los cuales trabajó setecientas dos horas extras, y que su salario de $12.50 semanales equivale a $1.78 diarios por jornadas de ocho horas, o sea veintidós centavos por hora; y que computadas las setecientas dos horas extras a doble tipo de compensación, importan $308.88.

Basados en esas alegaciones, Narciso Torres y Rafael Vázquez solicitaron sentencia a su favor por $1,807.52 y $308.88, respectivamente.

El apelante levanta en este recurso la cuestión de que la demanda no aduce hechos constitutivos de causa de acción a favor de los apelados. Arguye, como se hizo en el caso de *Alcalá* v. *Ponce Star Line, Inc.*, ante, pág. 860, resuelto el día 3 del actual, que el trabajo que verificaron los demandantes no está comprendido dentro de las disposiciones de la Ley núm. 49 de 7 de agosto de 1935 (Sesión Extraordinaria, pág. 539). Ese punto fué entonces resuelto adversamente a las pretensiones del apelante, y nada tenemos que agregar a lo que sobre ello dijimos.

Consideremos ahora los méritos del caso.

La prueba es contradictoria, pues mientras Narciso Torres, uno de los querellantes, asegura que trabajó doce horas diarias durante la duración de su empleo y Rafael Vázquez, el otro querellante, reclama una hora extra trabajada durante igual tiempo, el demandado Félix González

afirma que éstos, como todos sus demás empleados, sólo trabajaron ocho horas diarias, por las cuales recibieron $12.50 semanales, equivalentes a $1.78 diarios; y que si bien es verdad que el querellado Narciso Torres durante el período de la zafra, una semana sí y otra no, hacía un viaje diario a la una de la mañana a la Central Mercedita, en el cual invertía tres cuartos de hora, durante esas semanas se le pagó de mutuo acuerdo dos dólares semanales extras.

Al resolver ese conflicto a favor de los querellantes, dando entero crédito a sus declaraciones, el juez se expresa así:

"Como el querellado negó en su contestación, y trató de demostrar, y produjo testimonios de coempleados en el sentido de que dichos querellantes solamente trabajaban 8 horas al día, es evidencia que su teoría es que la suma de $1.78 pagada por día a Narciso Torres y a Rafael Vázquez lo era por días de 8 horas. Habiéndose justificado ante este Tribunal que dichos querellantes trabajaban horas en exceso de las 8 horas regulares, es obvia la conclusión de que estas horas extras no han sido pagadas por el querellado a los querellantes, y sólo resta liquidar su importe en armonía con la jurisprudencia sentada por el Hon. Tribunal Supremo en el citado caso de *Cardona* v. *Corte,* supra, o sea, a razón de doble tipo la novena hora y simple tipo las otras en exceso.

"Hecha la correspondiente operación aritmética, resulta adeudar el querellado al querellante Narciso Torres $481.80 por el total de las novenas horas trabajadas y no satisfechas calculadas al doble tipo de $.44 la hora, y $722.70 por el remanente de horas extras en exceso de la novena hora calculadas al tipo simple de $.22, o sea, la parte querellada se encuentra adeudando al querellante Narciso Torres la suma total de $1,204.50.

"En cuanto al querellante Rafael Vázquez, el querellado resulta adeudarle $481.80 por el total de las novenas horas trabajadas y no satisfechas calculadas al doble tipo de $.44 la hora."

¿Erró la corte al así apreciar la evidencia?

De una parte tenemos las declaraciones de los querellantes y de otra tenemos la del querellado, quienes son las personas que en mejores condiciones se hallan para conocer la verdad de lo sucedido.

Comencemos por establecer la forma en que según los querellantes se inició el contrato de trabajo. Narciso Torres declara en el examen de repreguntas que una vez solicitó de Félix González que lo emplease y que éste le contestó que no tenía trabajo, que cuando hubiera una oportunidad lo llamaría; que después lo mandó a buscar para trabajar, sin pactarse sobre salario y horas de trabajo, y que al terminar la semana [a pesar de haber comenzado a trabajar el martes] le pagó $12.50; que a la semana siguiente [aunque la trabajó completa] le pagó también $12.50, y así continuó durante los tres años que duró su empleo. Al preguntársele por el abogado del demandado si estuvo conforme con ese salario, y si en alguna ocasión había reclamado al señor González algo que le debiera por su trabajo, manifestó: "Bueno, estaba trabajando por doce pesos y medio . . . No le reclamé nada. No tenía en la mente que me debía nada."

Y Rafael Vázquez, refiriéndose a la forma en que se inició su contrato de trabajo, declaró: "Yo venía guiando una guagua de la Playa, y me dijo [el demandado] que si yo quería trabajar con él, y le dije que estaba dispuesto. Entonces empecé a trabajar y cuando terminé de trabajar el domingo me dió doce pesos y medio." "¿Entonces no le dijo el trabajo que usted tenía que realizar por eso?", le preguntó el abogado del demandado, y contestó: "Yo empezaba a trabajar a las cinco de la mañana, cuando solamente había dos guaguas, y salía a las doce de la noche, con media hora para almorzar y media hora para comer."

Declaró este testigo que esto ocurrió en 1929. Compárese la forma en que se inició este contrato de trabajo con la manera en que se inició el de Narciso Torres el 28 de agosto de 1938, y se verá que a pesar de haber transcurrido nueve años entre la iniciación de uno y otro, en ambos se siguió el raro procedimiento de una invitación a trabajar como chófer de una empresa de guaguas, y a pesar de no existir una tarifa para esa clase de trabajo, al patrono no se le ocurre decir al obrero cuánto va a pagarle y cuánto tiempo deberá tra-

bajar, y lo que es más raro aún, el empleado tampoco lo pregunta para poder determinar si la proposición del patrono es aceptable. Luego, al final de la semana, a pesar del trabajo excesivo que alegan los querellantes haber hecho, el patrono les entrega la cantidad de $12.50 y ellos la reciben sumisos, sin protesta ni investigación alguna.(1)

Veamos ahora la versión del querellado sobre la manera en que se inició el trabajo del querellante Vázquez:

"P. Rafael Vázquez trabajaba con usted, ¿como qué? R. Como chófer.

"P. ¿De qué? R. De una de las guaguas mías.

"P. . . ¿Cómo convinieron ustedes hacer ese trabajo? R. Esa guagua, como trabajaba un promedio de catorce a quince horas, necesita dos chóferes, y gestioné dos chóferes, o sea a Carlos Febles, que entró conmigo desde el año mil novecientos veintiséis, y a Vázquez.

"P. Entonces, entre [sobre] el período de trabajo y el salario que el señor Vázquez ganaría, ¿qué se estableció? R. Le hablé a ellos, a los dos. Cuando les fuí a hablar les dije que si querían trabajar conmigo, y me dijeron que sí. Les pagaba doce cincuenta semanales, a razón de uno setenta y ocho diarios.

"P. Y el tiempo a trabajar, ¿cómo se estableció? R. La guagua trabaja catorce horas, y uno solamente no puede trabajar catorce horas.

"P. ¿Cómo estableció los períodos? R. Puse dos chóferes."

Y refiriéndose al contrato con Narciso Torres, declaró:

"Lic. Tormes: P. . . ¿Conoce a Narciso Torres? R. Sí, señor.
"P. ¿Qué trabajo hacía para usted? R. Era chófer.
"P. Explique el convenio de trabajo: cuáles eran las condiciones, términos, precio, etc. Explíquelo. R. Cuando yo conocí a Narciso, él estuvo a buscar trabajo, y le dije que se presentara con la tarjeta de la Comisión de Servicio Público. Entonces entró como suplente, no como chófer.

"P. De agosto de mil novecientos treinta y ocho a agosto de mil novecientos cuarenta y dos, explique el contrato de trabajo suyo con

---

(1) Es casi inconcebible que después de cuarenta años de predicación a los obreros de Puerto Rico sobre sus derechos relacionados con su trabajo, un chófer de una empresa de autobuses en la ciudad de Ponce trabaje doce horas día por día durante tres años consecutivos, sin la más mínima protesta.

el señor Narciso Torres. R. Narciso Torres como suplente ganaba diez pesos semanales, y cuando era chófer regular, ganaba doce cincuenta.

"P. ¿Por qué tiempo era eso? R. Ocho horas diarias.

"Sr. Juez: P. Empecemos otra vez. Narciso, ¿cuándo empezaba? R. A las cinco y media de la mañana, hasta las ocho de la mañana. A las ocho de la mañana terminaba su trabajo y se iba a guardar la guagua. En ese viaje de las ocho de la mañana, traía a los escolares de la Central Mercedita, y de allá se traía a las muchachas de la destilería, que salían a las once y media de allá.

"Lic. Tormes: P. ¿Hasta qué hora? R. Llegaba a Ponce y viraba para la Central Mercedita a buscar los escolares que dejó allá. Entonces llegaba a la una menos diez, y a la una estaba en el garage.

"P. ¿A qué hora comenzaba por la tarde? R. Después, a las tres de la tarde salía a llevar a los escolares que él dejó cerca de la escuela, y los llevaba a la Central Mercedita, porque los escolares salían a las tres. De allá trae trabajadores. Vuelve otra vez a la Central Mercedita, a buscar la gente que hay, que sale de allí a las cinco menos diez o a las cinco menos cinco, y tan pronto coge ese grupo de trabajadores, lleva la guagua al garage.

"P. ¿A qué hora? R. Como a las cinco y diez.

"P. ¿A qué hora volvía a salir por la noche? R. Por la noche le dije que tenía que hacer un viaje, de las ocho de la noche, a la Central Mercedita.

"P. ¿Hasta qué hora? R. Hasta las nueve menos cuarto.

Considerando ahora las horas que los querellantes alegan haber trabajado, tenemos de un lado que Rafael Vázquez trabajaba como chófer para el mismo patrono haciendo la misma clase de trabajo que hacía Narciso Torres, y mientras el primero sólo trabajaba una hora extra y percibía $12.50 semanales, Narciso Torres trabajaba no menos de doce horas diarias y en ocasiones quince, y a veces hasta hacía viajes a otros pueblos, transportando pasajeros, sin recibir remuneración alguna por dichos viajes, para al fin de la semana recibir los mismos $12.50 que por nueve horas de trabajo diarias recibía Rafael Vázquez. Y éste salario de $12.50 semanales en estas condiciones lo recibía Torres sin la menor

protesta, porque como dijera este testigo, "No le reclamé nada. No tenía en la mente que me debía nada."

Ahora consideremos la cuestión desde el punto de vista del patrono. Asumiendo, sin aceptarlo, desde luego, que el egoísmo del patrono lo llevara a exigir y a obtener de Narciso Torres que trabajase doce horas diarias por $1.78, ¿no es lógico que ese mismo egoísmo le impidiese pagar a Rafael Vázquez el mismo salario por nueve horas diarias de trabajo? Lo racional es que hubiese exigido a Vázquez la misma cantidad de trabajo que la rendida por Narciso Torres, y que de negarse éste, lo despidiera. Hubiera tenido que hacerlo así, en primer término, porque no había razón por la cual por el mismo dinero Vázquez no rindiese la misma jornada que Torres, y en segundo lugar, porque de permitir ese discrimen, al enterarse Torres hubiera protestado. Y es el caso que uno y otro continuaron trabajando para el demandado por tres años consecutivos, sin protesta de Torres por exigírsele más trabajo que a Vázquez, y sin protesta de González por no rendir Vázquez igual cantidad de trabajo que Torres.

La declaración de Félix González es lógica, consistente, y de ella surge claramente que su contrato con los demandantes era de una jornada de ocho horas diarias por $12.50 semanales.

Distintos pasajes de las declaraciones de los querellantes, por los absurdos, resultan ridículos. Llamado a declarar en examen de refutación para contradecir al querellado, quien aseguró que los chóferes empezaban a trabajar a las cinco y media y no a las cinco de la mañana, dijo Vázquez:

"Había una cuestión que el señor Félix González no la sabía. El señor Juan Matos, chófer, prefería hacer más pasaje que ningún otro chófer. Entonces había una disputa con el primero que saliera antes de las cinco de la mañana; y como quería presentar más pasajeros, había el regateo de pasaje, y salíamos antes de las cinco de la mañana, cuando el señor Félix González no se había levantado."

En ese momento le pregunta el juez: "Entonces, lo que ustedes hacían, ¿lo hacían por cuenta de ustedes?", y contesta: "Sí, señor." Repreguntado por el abogado del demandado, "¿Qué interés tenía Juan Matos en hacer regateos?", manifestó, "Le gustaba presentar que hizo doscientos pasajeros él solo. Eso era un placer para él." ¿Cómo se concibe que pagándose a los chóferes un salario fijo, independientemente del número de pasajeros transportados, estos chóferes, que no eran niños inexpertos, se les habría de ocurrir empezar a trabajar antes de las cinco de la mañana porque uno de ellos, sin motivo justificado, comenzara antes de la hora señalada para así tener el vano placer de informar un mayor número de pasajeros transportados?

Citemos ahora otro incidente similar en relación con el testimonio de Narciso Torres. Durante el examen de repreguntas, el abogado del demandado presentó al testigo para su identificación ciertos cheques expedidos a la orden de y cobrados por el testigo, entre ellos uno por veinticinco dólares. El testigo admitió que el cheque había sido expedido a su orden por González, y que la firma al dorso era la del testigo, quien había recibido su importe. Explicando el origen del cheque, declaró que se lo había regalado Félix González. Veamos ahora la explicación que sobre este cheque nos da el patrono. Declaró éste que Narciso Torres había tenido una pelea con un individuo en la Central Mercedita, y que con una sortija que usaba Torres le cortó la cara a aquél, quien se proponía vengarse. Enterado González de ello, en evitación de un disgusto de mayores consecuencias, indicó a Torres que dado lo sucedido, él no quería que volviese con las guaguas a la Central, y le propuso que aceptase trabajar en el taller percibiendo el mismo salario. Torres no aceptó y prefirió abandonar su colocación, por lo que el querellado, en cumplimiento de la ley, le entregó un cheque por veinticinco dólares, importe de dos semanas de trabajo.

¿No es acaso evidente que el juez sentenciador ha incu-

rrido en error manifiesto al dar entero crédito a estos testigos cuyas declaraciones han sido contradichas con tanta lógica y exactitud por parte del querellado?

La doctrina que nuestras decisiones han introducido en esta jurisdicción al efecto de que este tribunal acatará y aceptará las conclusiones de hecho a que hubiere llegado la corte inferior en la apreciación de la prueba, confiere una amplia facultad a la vez que impone una seria y delicada responsabilidad a las cortes de distrito en relación con la administración de justicia. Consciente de esa responsabilidad, debe el juez de distrito poner a contribución su talento, su conocimiento de la naturaleza humana y su laboriosidad toda, a fin de desentrañar la verdad del cúmulo de la prueba. La doctrina puede convertirse en espada de dos filos. Si los jueces cumplen su deber a cabalidad resultará un poderoso auxiliar en la correcta resolución de los pleitos, pero si por el contrario no se percatan de su delicada misión, la doctrina puede convertirse en instrumento de opresión e injusticia. En el ejercicio de su discreción en la apreciación de la prueba el juez debe actuar con entera independencia y sin otra preocupación que no sea la de dar a cada uno lo suyo. Repetidas veces hemos dicho que las leyes de justicia social como la aquí envuelta deben ser liberalmente interpretadas, a fin de poder lograr los elevados fines perseguidos por el legislador.([2]) Pero esto no implica que al apreciar la prueba en estos casos deba darse crédito a la declaración del obrero cuando de acuerdo con las circunstancias concurrentes no lo merezca. No debemos olvidar que la justicia, si bien se debe al obrero, también lo es debida al patrono. "Raygada virtud es la Justicia, segund dixeron los Sabios antiguos, que dura siempre en las voluntades de los omes justos, e da, e comparte a cada vno su derecho egualmente." Ley I, Título I, Tercera Partida.([3])

Convencidos como estamos que el juez de la corte inferior indebidamente dió crédito a las declaraciones de los quere-

---

([2]) *Montaner, Admor.* v. *Comisión Industrial*, 54 D.P.R. 722, 727.

([3]) A moción del juez sentenciador para que se eliminaran ciertas frases de este párrafo, el Tribunal dictó la resolución que aparece en la página 1032 de este Tomo.

llantes, incurriendo así en error manifiesto en la apreciación de la prueba, la cual demuestra que el contrato celebrado entre los querellantes y el querellado fué por ocho horas, que ellos en efecto trabajaron ocho horas y ninguna hora extra y que recibieron el precio de su trabajo,(³) procede *revocar la sentencia apelada y en su lugar dictar otra desestimando la querella.*

(³) Es verdad que de acuerdo con la declaración del querellado el chófer Torres en tiempos de zafra trabajaba, una semana sí y otra no, tres cuartos de hora extra por las noches, recibiendo por compensación, en adición a su salario ordinario, la cantidad de dos dólares semanales cuando así trabajaba. Pero en los autos no existe evidencia alguna que nos pueda servir de base para calcular la diferencia de lo que pueda adeudarle el patrono, y por consiguiente no podemos hacer un pronunciamiento sobre ese particular.