JUAN VEGA CAMACHO, Obrero, y DEPARTAMENTO DEL INTERIOR, Patrono, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, compuesta por los Sres. M. LEÓN PARRA, Presidente, y JUAN M. HERRERO y F. PAZ GRANELA, Comisionados Asociados, demandada, FONDO DEL SEGURO DEL ESTADO, Asegurador.

Núm. 209.—*Sometido:* Diciembre 2, 1940. *Resuelto:* Enero 16, 1941.

*Virgilio Brunet* y *José L. Novas,* abogados del recurrente; *Hon. Procurador General George A. Malcolm, E. de Aldrey, Procurador General Auxiliar* y *Víctor J. Vidal González* y *G. Atiles Moréu,* abogados los dos últimos del Fondo del Seguro del Estado, abogados del Fondo mencionado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

El obrero Juan Vega Camacho era un peón caminero encargado por el Departamento del Interior de Puerto Rico, que es un patrono asegurado, de la conservación y policía de ciertas secciones de las carreteras públicas núms. 54 y 2, en las inmediaciones del pueblo de Vega Baja. El día 11 de abril de 1936, día feriado por ser Sábado Santo, entre 2:30 y 3:30 de la tarde, dicho obrero fué recogido moribundo de la carretera núm. 2 y falleció antes de llegar o poco después de haber llegado a su casa.

El Administrador del Fondo del Estado resolvió que el caso no era compensable por entender, de acuerdo con el informe del médico que practicó la autopsia, que la muerte del obrero había sido producida por la esclerosis avanzada de las coronarias de que sufría el obrero y no por accidente alguno del trabajo. Confirmada por la Comisión Industrial la resolución del Administrador y denegada la reconsideración que fué solicitada oportunamente, los beneficiarios del obrero interpusieron el presente recurso, basándolo en los siguientes señalamientos de error:

"(a) La Comisión Industrial erró al apreciar la prueba pericial y al declarar que la muerte de Juan Vega Camacho se debió única y exclusivamente a que su lesión del corazón había llegado a un punto en que la muerte tenía que sobrevenirle hubiera estado o no trabajando.

"(b) La Comisión Industrial erró al declarar que la muerte de Juan Vega Camacho se debió a arterioesclerosis y no a endarteritis coronaria.

"(c) La Comisión Industrial erró al declarar que la muerte de Juan Vega Camacho no ocurrió como consecuencia de un accidente del trabajo."

Consideraremos dichos señalamientos conjuntamente, por referirse todos a la apreciación de la prueba pericial y testifical.

El artículo 11 de la Ley de Compensaciones por Accidentes del Trabajo, núm. 45 de 1935 ((1) pág. 251), según fué enmendado por la Ley núm. 121 de 1940 (pág. 729), nos autoriza para revisar cualquier orden o decisión de la Comisión Industrial, pero disponiendo "que dicha revisión solamente podrá concederse sobre cuestiones de derecho o apreciación de prueba cuando ésta sea de carácter pericial."

La prueba pericial puede resumirse así:

"... Declaró en primer término el Dr. A. Otero López que fué quien hizo la autopsia del occiso y manifestó, que al exponer el corazón éste se encontraba contraído en sístole y las arterias coronarias estaban anemiadas, tortuosas y prominentes, duras y resistentes al tacto; y al tratar de incindir una de ellas, el escalpelo encontró resistencia, produciendo un sonido metálico, y al tratar de exponer las arterias se apreció que estaban esclerozadas por calsificación orgánica. A preguntas que se le hicieron explicó que el sonido metálico producido por el escalpelo en las arterias, era indicativo de la calsificación interior de éstas producida por el depósito en ellas de detritus calcáreos por degeneración orgánica, llegando un momento en que las arterias se obstruyen y como consecuencia viene la anemia y por ende la muerte, pudiendo ésta sobrevenir en cualquier momento sin hacer esfuerzo alguno el paciente, como consecuencia de la obstrucción de las arterias y falta del riego sanguíneo. Que la calsificación de las arterias es un proceso lento, cuestión de años, no de días ni de meses y que la muerte del obrero Juan Vega Camacho fué producida por endarteritis coronaria que quiere decir induración por calsificación, o fibrosidad de la íntima de la arteria, o capa interna de ésta, y que su muerte al ocurrir mientras trabajaba fué una mera coincidencia, porque lo mismo pudo haber muerto de la lesión que tenía en su corazón, comiendo o durmiendo.

"El Dr. Boneta, médico asesor de la Comisión Industrial, declaró que dado el estado del corazón y de las arterias coronarias del obrero occiso según había escuchado al declarar al Dr. Otero pudo un esfuerzo realizado por el obrero causar su muerte, coincidió con el Dr. Otero en que el estado de las arterias según había sido descrito es producto de un proceso lento y evolutivo, y que partiendo de la base que no hubo rotura de vasos sanguíneos, pudo la muerte haber sido causada por deficiencia del riego sanguíneo del corazón pudiendo haber sobrevenido ésta lo mismo estando el paciente acostado que trabajando. La síntesis de las declaraciones de ambos médicos fué

que la lesión del corazón de Camacho era avanzada, consecuencia de un proceso de calsificación de las arterias coronarias, y que la consecuencia de este estado era inevitablemente la muerte.''

La teoría de los beneficiarios recurrentes es que el obrero falleció como consecuencia del esfuerzo que realizó para mover uno de los *''drums''* de asfalto que habían sido colocados a la orilla de la carretera núm. 2, el que tenía un peso de 3 ó 4 quintales. Para sostener esa teoría, los beneficiarios recurrentes ofrecieron prueba testifical, la cual ha sido correctamente resumida por la Comisión así:

''Gregorio Nadal, como Camacho, era caminero, y estaba encargado como dejamos dicho atrás, de un trozo de la carretera núm. 2 que estaba separado del de Camacho por otra porción de 4 kilómetros de la que estaba hecho cargo Manuel Miranda, declaró: que el día del accidente se trasladó desde su trozo de carretera al de Camacho para ayudar a éste a poner brea sobre el piso de la carretera cumpliendo una orden que al efecto había recibido del jefe Perfecto Díaz y que por ser el día de autos, Sábado Santo, habían sido autorizados ambos para dejar el trabajo temprano, y que así lo hicieron retirándose el declarante como entre 1:30 y 2:00 de la tarde para su casa, dejando a Camacho recogiendo los hierros del trabajo para retirarse también; y que se enteró de su muerte después que estaba el cadáver en su casa.

''Pedro Valentín, es hermano de la viuda de Camacho, y pasaba accidentalmente en compañía de Pedro Ramos por el sitio de la carretera núm. 2 en que se hallaba Camacho, declaró: que como a 20 ó 25 pies de distancia vieron a éste como recostado sobre un *dron* de asfalto y que al preguntarle ambos qué le pasaba cuando llegaron a él, les contestó que tenía un fuerte dolor en el pecho y que entonces el declarante y Ramos lo cargaron hasta su casa, situada un kilómetro más o menos de allí, muriendo 4 ó 5 minutos después de haber sido depositado en su lecho.

''Pedro Ramos, es el testigo que en compañía del anterior pasaba accidentalmente por el sitio del suceso y dijo que distinguió a Camacho desde 15 ó 20 metros de distancia antes de llegar a él; que éste se hallaba de espaldas a ellos haciendo fuerzas para levantar un *dron,* y que en ese momento cayó sobre el *dron,* y que cuando ellos se acercaron él se quejaba de un fuerte dolor en el pecho, que lo tomaron entonces en brazos y lo llevaron hasta su casa llegando a ésta muerto.

"Perfecto Díaz, celador de conservación de la carretera en que trabajaba Camacho y también Gregorio Nadal y Manuel Miranda, declaró: que en el día de autos no se estaba poniendo brea en la carretera núm. 2, y que tanto el trozo de la carretera núm. 54 de que estaba encargado Camacho como en la núm. 2, el trabajo de los camineros estaba limitado a la limpieza de las cunetas y orillas de la carretera con machete para quitar la yerba, y que no había dado orden alguna de asfaltar en la carretera núm. 2, ni durante el mes de marzo ni tampoco en abril, y que la única excepción en este trabajo rutinario de limpieza ocurrió en los días 19 y 20 de marzo, en que Camacho en compañía del caminero vecino a su trozo Manuel Miranda recibieran de él orden para efectuar un trabajo de reparación en la carretera núm. 2 denominado 'amarrar piedra' que consistía en colocar piedra triturada en algún hoyo existente, darle pisón y poner luego encima brea; que fuera de esos dos días no dió orden alguna a Miranda, a Nadal ni a Camacho de que hicieran trabajo de embreado en la carretera núm. 2, y que la única vez que en esos días habló con Nadal y con Camacho fué para decirles que fueran a cobrar el lunes próximo a la Semana Santa y que por la festividad tradicional del día Sábado Santo aunque no oficial, todos los camineros hicieron su trabajo de la manera más suave posible y que se les permitió retirarse para sus casas más temprano que de ordinario."

Al apreciar la prueba testifical, la Comisión llegó a las siguientes conclusiones:

"Por esta prueba se ve que el peso y valor de la totalidad de ella está en pro de que Camacho no realizó esfuerzo alguno en ese día. En primer lugar porque no se estaba haciendo trabajo de reparación con brea en la carretera en que se le encontró moribundo que hubiera justificado el que hubiera movido un *dron* de asfalto; después porque no había sido dada orden alguna en ese sentido por el jefe Sr. Perfecto Díaz; sin ella ni podía cambiarse el género de trabajo que estuvieren haciendo los camineros ni ninguno de ellos podía abandonar el trozo de que estaba encargado, como dijo Nadal hizo para ir a ayudar a Camacho en el suyo; y no vemos qué móvil hubiera impulsado al Sr. Perfecto Díaz, celador de conservación de carreteras, en ocultar este hecho, de haber existido, que ningún beneficio le reportaba y que por el contrario iba a acarrear un perjuicio grande y definitivo a la familia de uno de sus empleados. El único testigo que afirma que vió cuando Camacho hacía esfuerzo

para levantar un *dron* fué Pedro Ramos, que dijo que vió a aquél de espaldas desde una distancia de 15 ó 20 metros, como tratando de levantar un *dron* de asfalto, y que en ese momento cayó sobre éste, etc. Opinamos que la posición de espaldas como distinguió Ramos a Camacho desde 15 ó 20 metros de distancia con su cuerpo inclinado sobre un *dron,* no permite llegar a la conclusión cerrada de que en verdad estuviera tratando de levantar éste; pudo estar recostado sobre el *dron* descansando, por el fuerte dolor que sentía en su pecho consecuencia de haber llevado a su clímax la enfermedad del corazón que padecía. El mismo compañero de Ramos, Pedro Valentín, cuñado de Camacho, no se atreve hacer una afirmación tan terminante sobre lo que hacía Camacho, limitándose a decir que cuando él lo distinguió desde cierta distancia Camacho estaba recostado sobre un *dron* y que al acercarse a él lo encontraron en la misma posición sobre el *dron,* diciéndoles entonces que tenía un dolor, etc.

''Además, no es creíble que si ya se había terminado todo trabajo en la carretera según nos dijo el caminero Nadal, que sostuvo trabajo ese día en compañía de Camacho hasta el punto de haberse marchado éste para su casa dejando a Camacho recogiendo los instrumentos del trabajo para retirarse también, se pusiera éste a bregar solo con un *dron* de cuatro quintales de peso, cuando como antes queda dicho estaban los camineros autorizados para alquilar a dos obreros que les ayudaran a moverlos, cuando ello era preciso.''

La prueba pericial, creída por la Comisión, sostiene la conclusión a que llegó la Comisión al efecto de que la enfermedad de que padecía Camacho fué la causa única y exclusiva de su muerte. La prueba testifical es claramente insuficiente para sostener la teoría de los peticionarios y opinamos que la Comisión no erró en manera alguna al apreciarla.

*Debe confirmarse la resolución recurrida.*