JUANA RIVERA CABRERA y el menor RESTITUTO MALDONADO ALVARADO, ETC., recurrentes, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, ETC., demandada; G. ATILES MOREU, ADMINISTRADOR DEL FONDO DEL SEGURO DEL ESTADO, interventor.

Número 494.

*Sometido:* 9 de mayo de 1956. *Resuelto:* 18 de junio de 1956.

*A. Cadilla Ginorio,* abogado de los recurrentes; *Aida Casañas O'Connor* y *Donald R. Dexter,* abogados del interventor.

*PER CURIAM:* Tomando en consideración la condición idiopática del obrero, (hipertrofia y dilatación extrema del corazón), de la cual tenía conocimiento su patrono, la clase de trabajo que él ejecutaba y el esfuerzo por él realizado pocos momentos antes de sorprenderle la muerte debido a un colapso cardíaco por dilatación del corazón, se ha pro-

bado en este caso el esfuerzo extraordinario que se requiere para que la muerte constituya un accidente compensable, de acuerdo con la Ley núm. 45 de 18 de abril de 1935, según enmendada. Véase *Cordero* v. *Comisión Industrial*, 68 D.P.R. 127 (1948); *Masse* v. *James H. Robinson Co.*, 301 N. Y. 34, 92 N.E.2d 56 (1950). En consecuencia, *la resolución de la Comisión Industrial será revocada y el caso devuelto para la determinación de la compensación que corresponda, conforme a la ley.*

El Juez Presidente Sr. Snyder y el Juez Asociado Sr. Marrero disintieron.

---

Opinión concurrente del JUEZ ASOCIADO SR. NEGRÓN FERNÁNDEZ.

En el presente recurso se impugna la apreciación de la prueba pericial hecha por la Comisión recurrida y su conclusión de que la muerte del obrero Restituto Maldonado— certificada, sin que mediara autopsia, como debida a *colapso cardíaco por dilatación del corazón*—no era compensable de acuerdo con la Ley núm. 45 de 18 de abril de 1935, según enmendada.

La prueba, según la resume en este caso la Comisión recurrida, es la siguiente:

"El testigo Víctor Rivera Muñoz en síntesis declaró que en marzo de 1953 era Administrador del Hospital Municipal de Arecibo; que conoció al obrero Restituto Maldonado; que éste trabajaba de chófer de ambulancia en el Hospital Municipal; que su trabajo era el de conducir la ambulancia cuando salía a buscar o a llevar enfermos, sirviendo en ocasiones también de camillero; que el día de autos el obrero terminó de lavar una ambulancia y subió a la oficina del testigo; que se sentó en una silla al lado del escritorio del testigo; que el testigo tuvo que salir de su oficina y al pasar por el lado del obrero lo vió sentado con las manos cruzadas y luego sintió un ruido y cuando miró el obrero se había caído al suelo; que lo cogió y lo puso en una camilla y que el médico de turno le examinó y dijo que estaba muerto.

"El Dr. Julio A. Santos en síntesis declaró que conoció al obrero por muchos años; que lo trataba como paciente privado; que en el año 1940 el testigo se hizo cargo de la beneficencia municipal en Arecibo y recomendó al obrero para trabajar como chófer de ambulancia; que en ese tiempo el obrero era un muchacho joven que estaba en buena salud pero que en los últimos años desarrolló una lesión en las válvulas mitrales probablemente de origen reumático, tenía una hipertrofia enorme del corazón y la presión estaba un poquito alta; que a veces llegaba fatigoso a su oficina, que lo vió en muchas ocasiones; que le recomendó que siempre tomara digital y le recomendó que dejara el trabajo, que cualquier esfuerzo que hiciera o que guiando la ambulancia podía quedarse muerto peligrando además la vida de los que fueran en la ambulancia; que el obrero le decía que no podía dejar el trabajo, que tenía necesidad de trabajar; que murió de una muerte repentina como él esperaba que muriera, que el estado del obrero no era para hacer ninguna clase de esfuerzo; que en el desempeño de sus labores como chófer de la ambulancia municipal a veces este obrero trabajaba 24 horas y que el esfuerzo que él hacía de manejar la ambulancia podía precipitarle la muerte; que el obrero en las condiciones en que estaba podía morir en cualquier momento.

"El Dr. José Angel Martínez en síntesis declaró que es el Director Médico del Hospital Municipal de Arecibo, cargo que ejerce desde 1949; que cuando el obrero falleció él no se encontraba presente en el Hospital; que lo llamaron y cuando vino ya el obrero estaba muerto; que él sabía que este obrero estaba padeciendo desde hacía bastante tiempo de una enfermedad del corazón—que tenía dilatación del corazón—que se certificó la muerte como debida a colapso cardíaco por dilatación del corazón; que varias veces el testigo pidió el traslado de este obrero por causa de su enfermedad pero nunca hubo otra oportunidad de un trabajo más liviano para él que tuviera la misma o mejor remuneración; que el hecho de él seguir trabajando en ese trabajo ayudó a acelerar su muerte pero que era una cosa definitiva que él iba a morir de esa enfermedad.

"El Dr. G. Marqués en síntesis declaró que concurre con la opinión del Dr. Martínez añadiendo que cuando él empezaba a hacer trabajos de radiología hizo al obrero una fluoroscopía y notó que tenía una hipertrofia enorme del corazón y tenía

soplos; que el testigo informó al obrero que estaba mal del corazón y que no debía hacer esfuerzos grandes; que él no era su médico pero que le hizo esta recomendación.

"La prueba en este caso demuestra que el obrero Restituto Maldonado padecía de hipertrofia y dilatación del corazón; que él sabía que padecía de esta enfermedad; que se le había recomendado que evitara hacer esfuerzos de clase alguna y que el día 27 de marzo, 1953, mientras desempeñaba las labores de su cargo como chófer de la ambulancia municipal, y mientras estaba sentado en la oficina del Administrador falleció repentinamente, certificándose su muerte como debida a colapso cardíaco por dilatación del corazón."

La regla para determinar la compensabilidad de muertes del corazón ocurridas en el curso del trabajo, ha dejado de ceñirse inevitablemente, según una fuerte expresión de la jurisprudencia de los últimos años, al requisito estricto del esfuerzo extraordinario (*unusual exertion*) para aceptar la más adecuada norma del esfuerzo corriente como determinante del derecho a compensación cuando está envuelta trombosis coronaria, miocarditis o dilatación del corazón, entre otras. 1 Larson, *Workmen's Compensation Law*, sec. 38.30, pág. 526 et seq.; *Brzozowskit Case*, 102 N.E.2d 399 (Mass. 1951). Véase, además, Horovitz *on Workmen's Compensation* 88; 12 NACCA Law Journal 65; 11 NACCA Law Journal 74-76.

Dentro de esta regla, siempre se requiere un esfuerzo —algún esfuerzo—capaz de producir, según el criterio médico, el colapso, pues el progreso natural de una dolencia cardíaca puede llegar al climax fatal durante horas laborables cuando las actividades del empleado no requieren un esfuerzo que médicamente pueda pasar la prueba de causalidad. 1 Larson, ob. cit., sec. 38.83, pág. 565 et seq.

En el caso de autos el empleado padecía de hipertrofia del corazón y tenía soplos. Tomaba diariamente digital. Así realizó durante varios años su trabajo de conductor de la Ambulancia Municipal, sirviendo en ocasiones de camillero al traer o llevar enfermos, trabajando a veces hasta las 24 horas del día. Sus jefes inmediatos—médicos del

Hospital Municipal de Arecibo—pidieron varias veces al patrono el traslado de dicho empleado a un trabajo más liviano, porque éste no podía hacer "esfuerzos grandes." La prueba médica, según la resume la propia Comisión conforme al *record*, revela que "el hecho de él seguir trabajando en ese trabajo ayudó a acelerar su muerte" aunque "era una cosa definitiva que él iba a morir de esa enfermedad."

Es un hecho incontrovertido que el día de su muerte el empleado *terminó de lavar una ambulancia* y subió a la oficina del Administrador del Hospital, se sentó en una silla y a los pocos minutos cayó al suelo y al ser auxiliado estaba muerto.

Bajo los hechos de este caso estimo probada la relación causal entre la muerte del obrero y su trabajo. Precisamente por su dolencia cardíaca estaba expuesto a que un esfuerzo mayor que el que la condición de su corazón podía tolerar, le produjera un colapso del órgano vital que ya venía siendo trabajado en exceso como consecuencia de las condiciones en que se desenvolvían sus labores. El colapso inmediato al esfuerzo no es esencial para establecer conexión causal. Ernest P. Boas, *Cardiac Injury resulting from Effort or Trauma*, citado en 15 NACCA Law Journal 504–505. La agitación que conlleva la tarea de lavar una ambulancia—tarea que precedió por pocos minutos al colapso, y que no realizaba diariamente—cumple a cabalidad con el requisito de causalidad bajo la regla liberal del esfuerzo corriente, y posiblemente con la estricta del esfuerzo extraordinario. *Cordero* v. *Comisión Industrial*, 68 D.P.R. 127. La muerte producida por un acto que, dado el estado físico del obrero en ese momento, equivalga a un *esfuerzo*, se debe a un accidente, dentro del significado de la Ley, *Montaner* v. *Comisión Industrial*, 54 D.P.R. 121; *Merritt* v. *Department of Labor, etc.*, 251 P.2d 158 (Wash. 1952) y la existencia anterior de una enfermedad del corazón no impide su compensabilidad cuando ese esfuerzo contribuye a acelerar la muerte. *Colón* v. *Comisión Industrial*, 59 D.P.R. 850. *Cf.*

*Cordero* v. *Comisión Industrial*, 62 D.P.R. 647. Ello es así porque la industria toma al trabajador en las condiciones físicas en que éste se encuentre. De otro lado, por su carácter reparador, las leyes de compensaciones por accidentes del trabajo deben ser interpretadas liberalmente. *Montaner* v. *Comisión Industrial*, 54 D.P.R. 722; *Cordero* v. *Comisión Industrial*, 61 D.P.R. 361.

Por los fundamentos expuestos concurro en la revocación de la resolución recurrida.