BELÉN DUMONT VDA. DE FERNÁNDEZ FUSTER ET AL., recurrentes, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, ETC., demandada.

*Número:* 570.   *Resuelto:* 1 de mayo de 1962.

*Sara Torres Peralta, Luis E. García Benítez* y *S. L. Lagarde Garcés,* abogados de los recurrentes; *Donald R. Dexter y Carmen Ana Archeval,* abogados del Administrador del Fondo del Seguro del Estado.

El Juez Asociado Señor Blanco Lugo emitió la opinión del Tribunal.

En el pasado hemos reconocido que cuando la muerte o la incapacidad ha sobrevenido debido a que el empleado ha realizado un esfuerzo extraordinario que en alguna forma ha agravado, acelerado o precipitado el colapso cardíaco, se trata de un accidente del trabajo compensable. *Cordero* v. *Comisión Industrial*, 68 D.P.R. 127 (1948). Así, en *Rivera* v. *Comisión Industrial*, 79 D.P.R. 386 (1956) dijimos que tomando en consideración la condición idiopática del obrero—hipertrofia y dilatación extrema del corazón—y, entre otras cosas, el esfuerzo por él realizado momentos antes de sorprenderle la muerte —lavar la ambulancia de la cual era conductor—era suficiente a los fines "[d]el esfuerzo extraordinario que se requiere para que la muerte constituya un accidente compensable." Y en *Antongiorgi* v. *Comisión Industrial*, 80 D.P.R. 512 (1958) confirmamos la resolución que negó compensación en un caso de muerte por desfallecimiento del corazón, no sólo por no haberse establecido la relación causal entre la muerte y el accidente sufrido por el obrero varios días antes en su trabajo, sino también por la ausencia de prueba al efecto de que el occiso realizaba un "esfuerzo extraordinario". Cfr. *Sucn. París* v. *Comisión Industrial*, 52 D.P.R. 441 (1937); *Montaner* v. *Comisión Industrial*, 54 D.P.R. 121 (1939); *Montaner* v. *Comisión Industrial*, 54 D. P.R. 722 (1939); *Montaner* v. *Comisión Industrial*, 57 D.P.R. 330 (1940); *Vega* v. *Comisión Industrial*, 57 D.P.R. 870 (1941); *Maldonado* v. *Comisión Industrial*, 58 D.P.R. 28 (1941).■ ■ Es conveniente aclarar que el hecho de la

[1] Hemos resuelto consistentemente que la agravación de la condición idiopática de un obrero es compensable si se demuestra relación causal entre el accidente acaecido en el trabajo o como consecuencia del mismo y la precipitación del desenlace de la enfermedad preexistente. *Vélez* v. *Comisión Industrial*, 73 D.P.R. 181 (1952) (tuberculosis); *Atiles* v. *Comisión Industrial*, 69 D.P.R. 630 (1949) (asma bronquial); *Atiles* v. *Comisión Industrial*, 66 D.P.R. 791 (1947) (influenza); *Cordero* v. *Comisión Industrial*, 62 D.P.R. 647 (1943) (mal de Hodgkin); cf. *Colón* v. *Comisión Industrial*, 59 D.P.R. 850 (1942) (muerte cardíaca).

existencia de una enfermedad anterior contraída o producida por causas ajenas al empleo no excluye necesariamente la compensabilidad de la incapacidad o muerte resultante por motivo de dicha enfermedad. █

El problema que realmente tenemos que afrontar se refiere a la muerte cardíaca sobrevenida mientras el obrero está realizando la labor ordinaria y corriente del empleo, o sea, cuando no se trata de la ejecución de un esfuerzo extraordinario. En *Cordero v. Comisión Industrial*, 68 D.P.R. 127, 138 (1948) anunciamos la necesidad de que "[p]ara que el accidente sea compensable es menester que el esfuerzo equivalga a uno extraordinario o inusitado." La rigidez de esta norma fue controvertida en la opinión concurrente emitida por el actual Juez Presidente señor Negrón Fernández en *Rivera v. Comisión Industrial*, supra, al exponer que las decisiones más recientes se inclinaban a aceptar "la más adecuada norma del esfuerzo corriente" como determinante del derecho a compensación. Significativamente, posteriormente aclaramos que el esfuerzo extraordinario no depende de una comparación entre la labor que el obrero "acostumbraba ejercitar" y el esfuerzo por él realizado momentos antes de morir. *Antongiorgi v. Comisión Industrial*, supra, a la página 513 (1958) y *Trigo Hnos. v. Comisión Industrial*, 80 D.P.R. 520 (1958).

En realidad el problema se limita notablemente si partimos de la base de que la determinación final depende del contenido que demos al concepto "accidente". Según se indica en una reciente obra sobre el particular—H. F. McNiece, *Heart Disease and the Law* (Prentice Hall) 1961—la diferencia de criterio reside en si el requisito de "accidente" se considera desde el punto de vista de la causa o del efecto. Tradicionalmente para que ocurra un accidente todo cuanto se ha requerido es el acaecimiento de un suceso imprevisto o inesperado, pero algunas jurisdicciones estatales han requerido que la causa de la lesión o la muerte se deba a un

acontecimiento extraordinario no corriente. (²) De esta interpretación ha surgido la continua referencia a "esfuerzo corriente" y "esfuerzo extraordinario". Sin embargo, a medida que se analicen detenidamente ambas posiciones resultará que no parece haber conflicto alguno sobre la proposición de que el esfuerzo físico puede acelerar, agravar o precipitar una enfermedad cardíaca preexistente. El área de desacuerdo se reduce al grado de esfuerzo que es necesario ejercitar para que se considere como un accidente compensable. No nos detendremos a exponer detalladamente los principios que informan las dos posiciones antagónicas—esfuerzo corriente vs. esfuerzo extraordinario—porque en realidad el examen de las distintas decisiones sobre el particular no nos ayuda a formular una regla que pueda aplicarse con invariable seguridad, cuando menos, en la mayoría de los casos. Baste decir que localmente la misión de los organismos administrativos, en primera instancia, y de este Tribunal, no consiste en determinar el origen etiológico de la enfermedad sino que debe limitarse a determinar la existencia de una relación de causalidad entre la labor realizada y el resultado final—incapacidad o muerte—, o sea, si la labor contribuyó al resultado, mediante la agravación, aceleración o precipitación de la enfermedad. 1 Larson, *Workmen's Compensation*, sec. 12.20. En este sentido no cabe hacer distinción alguna entre el grado de esfuerzo, aunque siempre es necesario que

---

(²) En un excelente artículo, cuya lectura recomendamos, próximo a ver la luz en la Revista Jurídica de la Universidad de Puerto Rico (1962), el Profesor Larry Alan Bear, de la Facultad de Derecho de dicha universidad, expresa que este último requisito en efecto equivale a sostener que el obrero asume los riesgos ordinarios inherentes al empleo, porque aunque se admita que la lesión se produjo como consecuencia del empleo, se le negará compensación si se trata de que la labor realizada fue la ordinaria y corriente que se le requiere. Considera esta posición como un vestigio de antiguos principios del Derecho común injertados en legislación social que responde a distintas motivaciones filosóficas y que se diseñó especialmente para aliviar el rigor del derecho —mediante la eliminación de las defensas de negligencia contribuyente, asunción de riesgo y daños causados por un compañero del trabajo—cuando se aplicaba a reclamaciones por incapacidad o muerte sufrida en el trabajo.

se haya realizado alguno. Prácticamente la función de adjudicación consistirá en un examen cuidadoso de los hechos con miras a descubrir la relación causal apuntada, pues raras veces es posible precisar lo que constituye un esfuerzo extraordinario o corriente divorciándose de los hechos particulares de cada caso específico.(³) Cualquier manifestación anterior en nuestras opiniones que requiera ineludiblemente un esfuerzo extraordinario para que el caso sea compensable debe entenderse expresamente revocada.

El doctor Manuel Fernández Fuster murió cuando apenas contaba cuarenta y ocho años de edad, después de haber dedicado la mayor parte de su actividad profesional al servicio público como Director del Departamento de Ginecología y Obstetricia del Hospital de la Capital y catedrático de la Escuela de Medicina de la Universidad de Puerto Rico. En el cumplimiento de sus deberes sobresale una nota de acendrada devoción y dedicación a las tareas que asumió. Los últimos cuatro meses de su vida forman el marco dentro del cual se desenvuelve esta reclamación—como accidente del trabajo. ▮

Padecía arteriosclerosis. La dolencia comenzó a manifestarse cuatro meses antes de su muerte acaecida el martes 21

---

(³) La mayoría de las jurisdicciones estatales reconoce esta regla como determinante del derecho a compensación. Véanse, 1 Larson, *Workmen's Compensation*, sec. 38.30; *Ben Hur Coal Co.* v. *Orum*, 366 P.2d 919 (Okla. 1961); *Thomas* v. *Aetna Casualty & Surety Co.*, 135 So.2d 505, 506 (La. 1961); *I.B.S. Manufacturing Co.* v. *Dependents of Cook*, 130 So.2d 557 (Miss. 1961); *Hartford Accident & Indemnity Co.* v. *Gant*, 346 S.W.2d 359, 363 (Texas 1961); *McGeorge Construction Co.* v. *Taylor*, 350 S.W.2d 313 (Ark. 1961); *Harper* v. *Henry J. Kaiser Construction Co.*, 344 S.W.2d 856 (Ark. 1961); *Troup County* v. *Henderson*, 121 S.E.2d 65, 70 (Ga. 1961); *Burkley* v. *Atlantic City*, 172 A.2d 1 (N.J. 1961); *Coleman* v. *Andrew Jergens Co.*, 168 A.2d 265 (N.J. 1961); *Abbott* v. *Bedford Products, etc.*, 221 N.Y.2d 840 (1961); *Baum* v. *B. & B. Auto Works*, 222 N.Y.S.2d 559 (1961); *Witten* v. *Sargoy & Stein*, 222 N.Y.S.2d 369 (1961); *Ins. Dept. of Miss.* v. *Dinsmore*, 102 So.2d 691 (Miss. 1958); *Ciuba* v. *Irvington Varnish & Insulator Co.*, 141 A.2d 761 (N. J. 1958); Notas, 19 La. L. Rev. 916 (1959); 13 Rutg. L. Rev. 390 (1958); 37 Tex. L. Rev. 258 (1958); 33 Wash. & Lee L. Rev. 420 (1958).

de enero de 1958: estaba pálido, demacrado, por momentos se tornaba lívido, denotaba cansancio, se observaban cambios en el color de su rostro. Se le notaba sumamente tenso, preocupado, fatigoso, y "no tenía la brillantez y lucidez que le caracterizaban." Esta tensión obedecía a los "problemas que se fueron agregando a sus tareas habituales", y que se originaron principalmente en el proyectado traslado de la Escuela de Medicina del Hospital de la Capital al Hospital de Distrito de Bayamón, que implicaba el fin de la obra por él comenzada, las dificultades a que se enfrentaba en la dirección que le había sido encomendada del Departamento de Ginecología y Obstetricia debido a la ausencia de facilidades y limitaciones en la asignación del presupuesto de funcionamiento, y el aparente fracaso de su acariado proyecto de establecer un banco de sangre en el hospital. Se quejaba frecuentemente del exceso de trabajo—"me estoy matando"— especialmente de las reuniones de distintos comités a que pertenecía que eran más frecuentes, marcadamente durante el período que precedió a su defunción. En una ocasión tuvo un fuerte dolor en el pecho con radiación al brazo derecho que fue diagnosticado como un ataque de angina, y a pesar de que se le recomendó reposo, descanso y disminución en el ritmo de su trabajo, continuó atendiendo sus labores en la forma usual y realizando un trabajo más intenso debido a los factores antes apuntados.

Generalmente la labor diaria del occiso comenzaba alrededor de las ocho de la mañana y terminaba a las seis de la tarde, con un breve intervalo para almorzar. Luego, durante la noche, asistía a reuniones de comités, y si permanecía en su hogar, se dedicaba a preparar el material para su cátedra en la Escuela de Medicina. Raras veces se retiraba a descansar antes de las once de la noche, aun cuando la prueba revela que en el período anterior a los cuatro meses que precedieron a su muerte, disfrutaba de más descanso y reposo.

El día 20 de enero concurrió a una reunión que se celebró para discutir problemas relacionados con el Hospital de la Capital y que se prolongó hasta pasadas las once horas de la noche. Antes de asistir a esta reunión, llegó a su hogar cerca de las siete; estaba "desencajado" y le manifestó a su esposa que "voy a tener que dejar la escuela, ... acabo de pasar un mal rato...", refiriéndose a que no había logrado un aumento en el sueldo de su asistente inmediato a pesar de que así se le había prometido. Se le notaba "pálido y tembloroso", y durante la reunión estaba "tenso y preocupado". A su regreso al hogar se mantuvo desvelado, a pesar de lo cual se levantó a la hora acostumbrada y salió el día 21 fatídico para el trabajo a las siete de la mañana. Cerca de las nueve, en su oficina sita en el tercer piso del hospital, recibió la visita del doctor José García García, profesor médico asociado de ginecología y obstetricia, con quien discutió sobre los asuntos de la institución, revelando una honda preocupación y su decepción con la falta de solución al problema de la limitación del personal. Aproximadamente quince minutos después, sintió un fuerte dolor en la región cardíaca, y expresó que "[t]engo un dolor en el pecho y en el brazo derecho que se me corre al otro brazo." Permaneció con la cabeza entre sus manos inclinado sobre el escritorio. Se trataba de lo que se caracterizó como "el episodio final", una catástrofe de la arteria coronaria. A pesar de haber sufrido este ataque, continuó en sus labores, y descendió las escaleras del tercer piso al primer piso para dirigir una revista de las pacientes (*ground rounds*) en compañía de sus asistentes y estudiantes de la escuela, y que consiste en visitar cama por cama los distintos pacientes para con vista de los síntomas e investigación por medio de preguntas poder diagnosticar cada caso.[4] En una de las ocasiones tuvo necesidad de inclinarse para exa-

---

[4] En opinión del doctor García, esta revista de pacientes requiere un esfuerzo físico superior. El occiso venía desempeñando esta labor desde que comenzó a prestar servicios en la Escuela de Medicina.

minar una paciente que presentaba una mola hidatídica. Durante esta revista se mantuvo en continuo movimiento y examinó los casos de once pacientes. No pudo terminar la labor. Se retiró pálido y demacrado a su oficina, para lo cual subió hasta el tercer piso. No regresó por la tarde a dictar la cátedra que tenía señalada. Permaneció recluido en su hogar en donde fue visitado por el doctor Ernesto Marchand cerca de las seis de la tarde y quien le encontró en estado de choque (shock). Le tomó un electrocardiograma que confirmó la catástrofe coronaria sufrida, y un examen de la sangre que reveló la presencia de un infarto. Como presagiando su muerte inminente le confesó que "me he matado". Y desafortunadamente así sucedió esa misma noche.

La Comisión Industrial, mediante una opinión dividida, sostuvo que la muerte del doctor Fernández Fuster no se debió a un accidente del trabajo, sino al desenlace natural de su innegable condición arteriosclerótica. Se fundó principalmente en a) ausencia de prueba sobre la realización de un esfuerzo extraordinario; y, b) que aun cuando se admitiera la compensabilidad fundada en el esfuerzo corriente, la evidencia revelaba que el día de la muerte, el occiso trabajó menos que lo que acostumbraba. En cuanto al primer fundamento ya hemos expuesto como doctrina para esta jurisdicción que el grado de esfuerzo no es el criterio para determinar la compensabilidad, sino la existencia de relación causal entre la incapacidad o muerte y algún incidente en el trabajo; y respecto al segundo, la norma cuantitativa empleada no tiene apoyo alguno como índice de compensabilidad, sino que deben examinarse todas las circunstancias inmediatas para resolver si ocurrió un accidente que agravó, aceleró o precipitó el resultado final por el cual se reclama. ■

El doctor Marchand, sin la confirmación de un examen patológico, certificó la causa de la muerte como "oclusión aguda coronaria *debido a arteriosclerosis y otros factores.*" No vamos a resumir el contenido de las autorizadas opiniones

periciales que fueron vertidas en la vista ante la Comisión Industrial. Del cuadro de hechos expuesto surge claramente a nuestro juicio que entre los "varios factores" que, cuando menos, aceleraron y precipitaron la muerte del doctor Manuel Fernández Fuster están el esfuerzo físico realizado el día de su deceso después de sufrir el ataque descrito como una catástrofe coronoria y la tensión emocional a que estuvo sometido durante los últimos cuatro meses de su vida, (5) que demandaron de su corazón ya enfermo una actividad superior a su capacidad.

*Se revocará la resolución dictada por la Comisión Industrial y se devolverá el caso con instrucciones para compensar esta muerte.*

(5) No estamos resolviendo en esta ocasión si el esfuerzo o tensión emocional únicamente son suficientes para justificar una determinación de compensabilidad, ya que estimamos que la prueba justifica una conclusión sobre la presencia del esfuerzo físico necesario para establecer la relación causal. Véanse, sin embargo, *Klimas* v. *Trans Caribbean Airways, Inc.*, 176 N.E.2d 714 (N.Y. 1961); *Ins. Dept. of Mississippi* v. *Dismore*, 102 So.2d 691 (Miss. 1958); cfr. *Feliciano Figueroa* v. *Comisión Industrial*, 84 D.P.R. 196 (1961). Véanse además, McNiece, *Heart Disease and the Law*, (Prentice Hall, 1961), Capítulo 6, *Mental Strain as a Cause of Cardiac Injury*, págs. 25–33; Nahum, *Trauma and Heart Disease*, Med. Trial Tech. Q. (Dic. 1961) págs. 45–56; Sigler, *Strain as a Cause of Heart Disability and Death*, Med. Trial Tech. Q. (1961), págs. 205–218; Sigler, *Workmen's Compensation for the Cardiac*, 4 Am. J. of Card, (1959), págs. 261–265; 416–418; 557–561; Sigler, *The Evaluation of Claims for Workmen's Compensation in Cardiac Disability and Death*, 25 Ind. Med. & Sury. 10–15 (1956); *White, Trauma, Stress and the "Arterioscleorotic" Heart (Coronary Heart Disease)*, Med. Trial Tech. Q. (1956), págs. 135, 143; Moritz, *Coronary Thrombosis*, Med. Trial Tech. Q. (1955), págs. 72–74; Boas, *Cardiac Injury Resulting from Effort of Trauma* (1955), pág. 104; Moritz, *Trauma and Heart Disease*, West Res. L. Rev. 113 (1954); Texon, *Heart Disease and Industry*, (Grune and Straton (1954), págs. 288–291 y 302–304; Sigler, *Cardiac Disability and Death Caused by Strain: Problem in Workmen's Compensation*, 154 J.A.M.A. 294–299 (1954); Sprague, *The Effect of Trauma and Strain on the Production and Aggravation of Hearts Disease*, 23 Bull. N.Y. Acad. of Med. 631–642 (1947); Willius, *Coronary Thrombosis*, 11 Ind. Med. 513–514 (1942). Notas: 29 U. Cinc. L. Rev. 280 (1960); 11 Syr. L. Rev. 135 (1959–60); 37 Tex. L. Rev. 258 (1958); 27 Ford L. Rev. 462 (1958).