JOSÉ M. ALONSO GARCÍA, en su carácter de ADMINISTRADOR DEL FONDO DEL SEGURO DEL ESTADO, recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, recurrida y NATALIO BAYONET JIMÉNEZ, obrero occiso.

Número: O-74-119 Resuelto: 18 de octubre de 1974

*Jorge Márquez Gómez, Miguel A. Guzmán Soto* y *Antonio Allende Calderón,* abogados del recurrente; *Jorge de la Cruz Figueroa,* abogado de los beneficiarios del obrero occiso.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El doctor Natalio Bayonet Jiménez era Director Médico y Cirujano Médico del Fondo del Seguro del Estado. Le dedicó la mayor parte de su vida profesional—veintidós años—a dicha institución. Era alcohólico. Su condición mejoró al cesar su trabajo en el Fondo por un tiempo, pero más tarde volvió a agravarse su enfermedad. Laboraba mucho, no obstante, a menudo en adición al horario regular. Estaba bajo tratamiento psiquiátrico por razón de su enfermedad desde 1952 hasta el momento de su fallecimiento, ocurrido el 7 de junio de 1963. Se le recetaban tranquilizantes y barbitúricos para aliviarle las presiones en su trabajo que lo llevaban a excederse y le causaban insomnio muchas veces.

El doctor Bayonet regresó a su casa en estado de embriaguez a las dos y media de la mañana del día de su muerte. Había estado bebiendo en una comida no relacionada con las funciones de su cargo. A las seis de la mañana lo encontró inconsciente su esposa en el suelo de su habitación. Se le trasladó a un hospital y poco después murió. Según la autopsia, la muerte se debió a una intoxicación aguda, causada por una acción combinada de alcohol etílico y seconal. El análisis toxicológico reveló una cifra de alcohol en la sangre de 0.14% por peso y positivo de gran cantidad de barbituratos, equivalente a 9 x 100 mg. cápsulas de seconal ingeridas.

El 1 de abril de 1965, el Administrador del Fondo resolvió que la muerte del doctor Bayonet se debió a causas ajenas al empleo. En sus resoluciones de 11 de diciembre de 1972 y 7 de marzo de 1974 (la segunda se emite tras la radicación de moción de reconsideración por el Fondo), la Comisión Industrial revocó al Administrador. El Administrador interpuso recurso de revisión ante nos en el que alega que se cometieron dos errores: al determinarse que hay derecho a compensación en este caso cuando el mismo está exceptuado por el Art. 4 de la Ley de Compensaciones por Accidentes del Trabajo, Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 L.P.R.A. sec. 5; y al resolver la Comisión que ocurrió un accidente del trabajo bajo el artículo dos de la referida ley, 11 L.P.R.A. sec. 2.

I

El Art. 4 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 5, dispone:

"No son accidentes compensables del trabajo y no darán por consiguiente, derecho a compensación al obrero o empleado o a sus beneficiarios de acuerdo con esta ley los que ocurran en las siguientes circunstancias.

. . . . . . . .

2. Estando el obrero o empleado embriagado, siempre que la embriaguez fuere la causa del accidente."

A fin de comenzar a precisar el sentido de esta defensa veamos primeramente las circunstancias que provocaron su establecimiento en Puerto Rico.

Nuestra primera Ley de Compensaciones por Accidentes del Trabajo fue la Ley Núm. 19 de 13 de abril de 1916. Su Art. seis, equivalente al citado, utilizaba un lenguaje distinto al de la ley actual, negándose compensación "2. Cuando la embriaguez del obrero al tiempo del accidente haya sido la causa próxima de la lesión." El lenguaje de la ley vigente aparece por primera vez en su forma exacta actual en el Art. cuarto de la Ley Núm. 10 de 25 de febrero de 1918.

Ambas leyes se producen cuando el debate en Estados Unidos sobre la deseabilidad de prohibir la fabricación y venta de bebidas alcohólicas estaba en su apogeo. Se recordará que la Enmienda XVIII a la Constitución de Estados Unidos se propone por el Congreso a los estados el 19 de diciembre de 1917 y se proclama formalmente el 29 de enero de 1919. Véase la nota al texto derogado de la Enmienda XVIII en U.S.C.A. Puerto Rico, de hecho, se anticipó a la acción federal, al celebrarse, junto a las elecciones generales de julio de 1917, el plebiscito que sobre el particular ordenó el párrafo 20 del Art. 2 de la Ley Orgánica. Véase el Art. 15 de la Res. Conj. Núm. 5 de 12 de abril de 1917. (¹)

Al concluir este episodio de la historia estadounidense y de la puertorriqueña, sin embargo, y con el desarrollo de nuevos conceptos respecto al alcoholismo, la defensa de intoxicación se fue interpretando en modo cada vez más restrictivo. Ya es doctrina general, por ejemplo, que el peso de establecer los diversos elementos de la defensa, incluyendo el grado requerido de causalidad, recae en el patrono. Larson, Arthur: *Intoxication as a Defense in Workmen's Compensation*, 59

---

(¹) El debate sobre el modo de prohibir en Puerto Rico la fabricación y venta de bebidas alcohólicas jugó un papel de importancia en la aprobación de la Ley Orgánica, llegando a amenazar en un momento su adopción por el Congreso. 53 Cong. Rec. 3072-3074, 3467-3468, 64th Cong., 1st Sess.

Cornell L. Rev. 398, 406 (1974). 6 Schneider, *Workmen's Compensation*, pág. 15, 3rd ed., 1973 Supp. Cuando existe un conflicto en la evidencia es regla general también que la ebriedad no puede considerarse causa del accidente. Larson, *loc. cit.*

Al presente, treinta y seis estados conservan esta defensa como parte de su legislación respecto a compensación por accidentes del trabajo y tres permiten su utilización para mitigar el laudo. Larson, *op. cit.*, 405 *et seq.* Hay tres tipos de estatuto: los que permiten la defensa, sin referencia alguna al factor de causalidad; los que exigen que la intoxicación sea la causa próxima del accidente; y los que requieren que ella sea la única causa. *Ibid.* Larson, por ejemplo, *op. cit.* 407, equipara los estatutos que se refieren a accidentes "causados por" intoxicación a las leyes del segundo tipo, referentes a causa próxima. Del otro lado, otras autoridades estiman que "causa próxima" y "única causa" son términos equivalentes. *Kulinka* v. *Flockhart Foundry Co.*, 75 A.2d 557 (N.J. 1950). Esta decisión se ha considerado como representativa del grueso de las autoridades sobre el hecho de que la intoxicación no debe constituir una barrera a la compensación del obrero, a menos que se demuestre que constituyó la única causa de su lesión o muerte. Nota, *Workmen's Compensation—Recent Important Cases*, 6 NACCA L.J. 96–97 (1950).

De uno u otro modo, los dos últimos tipos de estatuto se han interpretado con extremo rigor, en especial los segundos. Véase, respecto al primero: *Haller Bev. Corp.* v. *Department of Indus. Labor and Human Relations*, 181 N.W.2d 418 (Wis. 1970), en que un vendedor de licores, con un nivel de alcohol en la sangre de 0.29%, falleció al cruzar su automóvil al lado contrario de la carretera y estrellarse contra un puente. Sobre los segundos, aún más estrictos, ha habido pocas decisiones en que se ha invocado con éxito la defensa. Larson, *op. cit.*, 411 *et seq.* Para algunos ejemplos, de los muchos existentes, de derrota de la defensa, examínense: *Jones Truck Lines, Inc.* v. *Letsch*, 436 S.W.2d 282 (Ark. 1969) (accidente causado

por alcohol combinado con píldoras recetadas por un médico para aliviar una dolencia proveniente de otra lesión) ; *May* v. *Accident & Cas. Ins. Co.*, 95 N.Y.S.2d 687 (1950) (mortal caída por escaleras con 0.34% de alcohol en la sangre) ; *Smith* v. *Pinkerton National Detective Agency*, 163 N.Y.S.2d 442 (1957) (muerte accidental de celador; 0.32% en la sangre; se le había prohibido expresamente ingerir bebidas alcohólicas en sus horas de empleo) ; *Barrett* v. *Al Charyn, Inc.*, 214 N.Y.S.2d 533, confirmado, 227 N.Y.S.2d 673 (1962) (muerte por acción combinada de intoxicación alcohólica y asfixia por gases emanados de un calentador). Concluye Larson, *op. cit.*, 417, su análisis de la defensa afirmando:

". . . Hasta el punto en que haya pie para la interpretación judicial de estos estatutos, los tribunales ordinariamente limitarán la defensa (aunque no invariablemente) hasta donde las palabras lo permitan. Esto está de acuerdo con el espíritu que permea la ley de compensación a obreros y su administración, que minimiza el elemento de culpa por parte del empleado y le imparte el máximo peso al elemento de proteger la seguridad y las familias de todos los trabajadores, incluyendo a los justos y a los injustos, a los merecedores y no merecedores, a los prudentes y a los negligentes—y hasta a los sobrios y menos sobrios."

En Puerto Rico, como hemos indicado, se descartó el concepto de causa próxima. Nuestro estatuto no cabe ciertamente dentro del primer tipo aludido, ya que continuó reteniendo el requisito de causalidad. Puede estimarse, en consecuencia, más a tono con la intención legislativa, así como con la evolución general del derecho sobre compensación a obreros y con el tratamiento de esta defensa, que es más razonable equiparar nuestra ley a la tercera modalidad mencionada de estatutos, la que requiere para su empleo eficaz que la intoxicación haya sido la única causa de la muerte. Debe señalarse en este sentido que no hemos hallado caso alguno ante este Tribunal en que la defensa se haya planteado con éxito. Las decisiones han

sido escasísimas. (²) El único caso donde se discute la naturaleza de la defensa, y esto en una opinión disidente, ya que el litigio se resolvió a base de otros principios, expresó de hecho lo siguiente:

"Para que la anterior defensa pueda prosperar, el patrono tiene que mostrar, por la preponderancia de la prueba, que la lesión del obrero fue ocasionada *únicamente* por su intoxicación." (Bastardillas nuestras.) *Hernández López* v. *Comisión Industrial*, 100 D.P.R. 1001, 1008 (1972).

■ Resolvemos que nuestro estatuto requiere prueba de que la intoxicación fue la causa única de la lesión, pero no es necesario pronunciarnos ulteriormente sobre el vital problema de la causalidad en esta parte de la opinión, dadas las conclusiones a que llegamos en su segunda parte.

Valga aclarar, no obstante, que al adoptarse en Puerto Rico la posición señalada ello no significaría que se estaría privando a la defensa de intoxicación de todo significado. En adición al escollo que representa el establecimiento de la necesaria causalidad, es posible, además, que bajo determinadas circunstancias la embriaguez constituya un abandono del empleo por parte del obrero que impida la compensación. Larson, Arthur: *Intoxication as a Defense in Workmen's Compensation*, 59 Cornell L. Rev. 398, 403 (1974).

## II

Debe examinarse ahora, sin embargo, si el empleado concernido falleció a causa de una lesión por accidente del trabajo o de una enfermedad derivada de su ocupación, según los términos y requisitos de la Ley. 11 L.P.R.A. sec. 2, párrafo 1. También aquí el derecho ha evolucionado rápidamente en las últimas décadas. Por mucho tiempo la doctrina tradicional requirió para determinar que había ocurrido un accidente la

---

(²)*Romero* v. *Comisión Industrial*, 57 D.P.R. 354 (1940), roza el problema, pero no cataloga nuestro estatuto.

existencia de un suceso inesperado y súbito, en lugar y fecha definidos. También se distinguía entre las lesiones causadas por accidente y las ocasionadas por enfermedad, aunque el significado del término "lesión" (*injury* en la versión inglesa de la ley presente, Art. 3 de la Ley Núm. 45 de 18 de abril de 1935, derivada de fuentes norteamericanas) no se entendía inicialmente en su alcance actual.

▪ Tanto el concepto de "accidente" como el de "enfermedad" se han expandido considerablemente. Según señala Larson, "El derecho de compensación a obreros se ha desarrollado mucho desde los tiempos en que algunos tribunales aparentemente pensaban que los términos 'accidente' y 'enfermedad' se excluían mutuamente. . . ." (Traducción nuestra.) 1A Larson's *Workmen's Compensation Law*, pág. 7–6, sec. 37.30, 1973. La diferencia, de hecho, entre estas dos palabras en Estados Unidos está perdiendo gradualmente su importancia, concediéndose compensación frecuentemente sin especificar la categoría a que pertenece la lesión. *Op. cit.*, sec. 41.31, pág. 7–262. El vocablo "lesión" se ha ampliado igualmente para incluir no sólo daños físicos sino emocionales. *Op. cit.*, secs. 38.65 y 42.00 *et seq.* El problema se está reduciendo claramente a la cuestión de probar que existe una relación causal entre la lesión y el empleo.

El cambio experimentado en el análisis por la jurisprudencia del impacto de especificar o no en una tabla estatutaria de enfermedades determinada dolencia es también de interés para el caso que nos ocupa. Siguiendo el ejemplo de Nueva York, el primer estado que confeccionó, en 1920, una tabla de este tipo, en Puerto Rico se adoptó el sistema cinco años más tarde. Véanse las leyes Núm. 102 de 1 de setiembre de 1925 y Núm. 85 de 14 de mayo de 1928, donde por primera vez aparece una lista de enfermedades en modo análogo al presente. La inclinación general antigua era a no conceder compensación en el caso de enfermedades no incluidas en la tabla. La tendencia actual es diametralmente opuesta, utilizándose

en ciertos estados el método de proveer una cubierta más amplia o, como en el caso del propio Nueva York y otras jurisdicciones, conservando la lista, pero dictaminándose que no excluye otras enfermedades. 1A Larson, *op. cit.*, págs. 7-260–1, sec. 41.20. Es importante señalar en este sentido que Larson cataloga a Puerto Rico entre las jurisdicciones que cuentan con el sistema más abarcador de compensación a obreros. *Ibid.*, 7-257–8.

Pueden añadirse ejemplos de alteraciones profundas en este campo del derecho de impacto directo en el caso ante nos, pero examinemos lo sucedido en nuestra propia jurisprudencia, lo que de por sí nos ofrece las guías para resolver el asunto bajo estudio en esta sección. Según ocurrió en muchas otras jurisdicciones, nosotros también nos inclinamos entendiblemente, hace años a trazar una línea tajante entre las voces "accidente" y "enfermedad" y a resolver que si una enfermedad no se mencionaba en la tabla estatutaria no era compensable. *Vda. de Salazar* v. *Admor. Fondo del Estado*, 76 D.P.R. 108 (1954); *Vélez* v. *Comisión Industrial*, 79 D.P.R. 282 (1956). Esta doctrina fue perdiendo terreno rápidamente, sin embargo, según sucedió en otros sitios. Ya en *Atiles* v. *Comisión Industrial*, 69 D.P.R. 630 (1949), por decisión de tres a dos, abandonada al cambiar la integración del Tribunal, se había anticipado de hecho la tendencia futura, resolviéndose que era compensable el asma agravada por la aspiración de humo, polvo y gases, a pesar de que dicha enfermedad no se mencionaba en la tabla de compensación.

En *Vda. de Fernández* v. *Comisión Industrial*, 85 D.P.R. 298 (1962), se socavan seriamente los cimientos de *Salazar*, labor que se continuó en *Hernández Nieves* v. *Comisión Industrial*, 90 D.P.R. 340 (1964), al amparo de legislación posterior, así como en *Feliciano Figueroa* v. *Comisión Industrial*, 84 D.P.R. 196 (1961), y que prácticamente se completó en *Rivera Rivera* v. *Comisión Industrial*, 100 D.P.R. 658 (1972).

Mas si accidentado ha sido el curso de nuestra jurisprudencia al decir lo que debe entenderse por "enfermedad", muy enfermizo es a su vez el estado de la vieja definición de "accidente". La venerable doctrina del esfuerzo extraordinario, por ejemplo, parte consagrada por años de nuestra jurisprudencia, fue repudiada expresamente en *Vda. de Fernández* v. *Comisión Industrial*, 85 D.P.R. 298, 305 (1962). Y, respecto al significado de la voz "accidente", se afirmó por este Tribunal hace diez años que "el concepto más evolucionado hoy imperante del accidente del trabajo . . . ya no descansa necesaria y únicamente en la existencia de aquel evento externo, súbito e imprevisto en el curso del empleo capaz de precisarse en tiempo y lugar, sino que puede ser también la lesión o efecto no esperados [*sic*] o sorprendentes [*sic*] producto de un acto realizado en circunstancias usuales y ordinarias de trabajo. . . . *Ortiz Candelario* v. *Comisión Industrial*, 90 D.P.R. 387, 395–6 (1964).

Aunque apegándose usualmente a la terminología tradicional, nuestra jurisprudencia revela que en la práctica la línea divisoria entre los conceptos de "accidente" y "enfermedad" va borrándose. Se ha ido apuntando cada vez con mayor claridad hacia la tendencia a no insistir tanto en la formulación de distinciones bizantinas entre dichos vocablos y a concentrar más bien en el requisito básico de causalidad, en la determinación de que existe la relación causal estatutariamente requerida entre la lesión o el daño sufrido y el empleo. Véanse a tales efectos, entre otras decisiones citadas, y cuidándonos de atender más el impacto del fallo que su semántica, el caso de *Feliciano Figueroa* v. *Comisión Industrial*, 84 D.P.R. 196 (1961), en donde se echa a un lado en efecto el factor del trauma físico como elemento indispensable del término "accidente" (todavía privaba *Salazar*), determinándose que un histerismo de conversión es compensable; y el caso de *Rivera Rivera* v. *Comisión Industrial*, 100 D.P.R. 658 (1972), que sostuvo que puede compensarse un daño sufrido gradualmente

al agravarse o acelerarse por los quehaceres del empleo una condición preexistente.

 Resolvemos que la insistencia clásica en sentar finos distingos entre lo que constituye un "accidente" y lo que entraña una "enfermedad" debe ceder ante el enfoque que desde hace tiempo se ha venido dictando. Lo verdaderamente importante es determinar si ha ocurrido una lesión *inherente al trabajo o empleo concernido o que ocurra o se agrave en el curso de éste.*

 Examinados los hechos en el caso de autos, hallamos que la evidencia representativa del necesario nexo causal entre el alcoholismo del lesionado y su empleo no satisface la regla de causalidad aquí enunciada y por lo tanto no se justifica la compensación en este caso.

Por los fundamentos expuestos, *se revocará la resolución de la Comisión Industrial.*

El Juez Asociado, Señor Angel M. Martín, concurre con el resultado en opinión separada.