JOSÉ P. ODRIOZOLA, demandante y recurrido, *v.* SUPERIOR COSMETIC DISTRIBUTORS CORPORATION, ETC., demandados y recurrentes.

*Número:* R-83-144     *Resuelto:* 28 de junio de 1985

*Radamés A. Torruella, Lidia González* y *Rossell Barrios Amy,* de *McConnell, Valdés, Kelly, Sifre, Griggs & Ruiz Suria,* abogados de las recurrentes; *Antonio Moreda Toledo,* de *Moreda Toledo & Rivera,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

El Sr. José P. Odriozola, luego de trabajar durante quince

años, primero como Gerente de Ventas y finalmente como Gerente General y Vicepresidente de Superior Cosmetic Distributors, Inc., afiliada de Germaine Montiel Cosmetiques Corporation, corporaciones dedicadas a la distribución y venta de perfumes y cosméticos, fue despedido de su empleo al alcanzar la edad de sesenta años. Inconforme, demandó a dichas corporaciones por alegados daños y perjuicios, amparándose en las disposiciones de la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. secs. 146 a 151) que establece una causa de acción civil por daños, basada en discrimen por razón de edad avanzada, raza, color, religión, origen o condición social del empleado.

Expedimos auto de revisión a solicitud de los demandados para revisar la sentencia recaída, que favoreció la posición del demandante. Los planteamientos en que se basan las recurrentes se reducen, en síntesis, a impugnar (1) la apreciación de la prueba hecha por el tribunal sentenciador, (2) la determinación sobre solidaridad en la responsabilidad que se les impuso, (3) la denegación de su alegado derecho de inmunidad bajo la Ley de Compensaciones por Accidentes del Trabajo y (4) la cuantía adjudicada como indemnización. Un cuidadoso análisis de dichos planteamientos, atendida la prueba practicada, y examinado el Derecho aplicable, nos mueven a resolver que son inmeritorios y que la sentencia debe ser confirmada.

I

*Los hechos*

A continuación exponemos un resumen de los hechos, basados en las determinaciones del Tribunal Superior y en nuestro examen·de los testimonios y prueba documental aportada por las partes.

El demandante y ahora recurrido, señor Odriozola, junto con la codemandada recurrente Germaine Montiel Cosmetiques Corporation, fundaron la corporación Superior Cosmetic Distributors, Inc. en agosto de 1964. Entonces contaba 45 años

de edad. Superior se encargaría, bajo la supervisión directa del Vicepresidente de la División Internacional y del Director de Área para América Latina de Germaine Montiel, de distribuir en Puerto Rico los cosméticos, perfumes y demás productos de belleza de esta corporación. Para agosto de 1979 los señores David Balthrop y Bernhard Guenther ocupaban, respectivamente, dichas posiciones en Germaine.

De Gerente de Ventas en 1964, el señor Odriozola pasó a ser Gerente General de Superior en 1967, desempeñándose a su vez como su Vicepresidente. No se cuestionó que hasta 1975 desempeñó eficientemente sus labores. Alegaron las recurrentes, como base del despido, que a partir de ese año las ventas y las ganancias de Superior comenzaron a declinar alarmantemente por culpa del señor Odriozola.

El señor Odriozola, por su parte, aceptó que hubo bajas en las ventas y, por consiguiente, en las ganancias, pero adujo que ello se debió, no a su culpa, y sí a la situación de la economía y del mercado de productos de belleza en Puerto Rico, y a actos de los propios recurrentes.

Independientemente de las razones que explicaran la baja en ventas, las recurrentes y el recurrido acordaron un plan de acción para enfrentarse al problema. Se acordó un programa de bonificaciones y aumentos salariales que aplicarían al recurrido si éste lograba incrementar las ventas de Superior. Gracias a ello ambas partes lograron su propósito. En octubre de 1978, el recurrido logró el aumento de sueldo más grande jamás recibido en los quince años que trabajó en Superior, por haber excedido en un 18% las ventas fijadas para el año fiscal 1977–1978. Las recurrentes felicitaron por escrito al recurrido con motivo de su labor y decidieron asignarle además el mercado de las Islas Vírgenes.

Sin embargo, aunque aparentemente por motivos no relacionados con la situación de la empresa, las recurrentes continuaron mostrando insatisfacción con el recurrido. Para agosto de 1979, éste tenía sesenta (60) años de edad. No quedaban

en la empresa compañeros de su época. Sus superiores eran hombres más jóvenes que él, que llevaban menos tiempo que él en sus puestos. David Balthrop tenía 38 años de edad y ocupaba el puesto de Vicepresidente de la División Internacional de Germaine hacía un año; Bernhard Guenther era un cuarentón que ocupaba el cargo de Director de Área de Germaine hacía unos ocho meses. Ya para junio de 1977, el entonces Vicepresidente Internacional de Germaine, David Batchellor, había llamado "toro viejo" al recurrido, diz que en forma jocosa. De todos modos, este último incidente demuestra la discrepancia en edades y enfoques entre el recurrido y los nuevos ejecutivos de Germaine.

A requerimiento de sus superiores, el recurrido se reunió en Nueva York el 3 de agosto de 1979 con Guenther y Balthrop en las oficinas de este último. Allí dichos ejecutivos expresaron al recurrido su gran interés en que aceptara un plan de retiro anticipado preparado por la empresa. Éste quiso consultar con su esposa si aceptaba o no la oferta que se le hacía, pero su reclamo fue desatendido. Al hallarse solo, sin poder consultar con su cónyuge, y sin asesoramiento, el recurrido firmó un documento donde aceptaba retirarse cinco años antes de lo pensado por él. Para acogerse a la jubilación tendría que pagar la aportación de los cinco años que la restaban para acogerse al plan de retiro. Según el testimonio del señor Balthrop, esta oferta fue hecha para evitar tener que cesantear al recurrido.

Odriozola regresó a Puerto Rico inmediatamente. Se le citó al bufete de McConnell, Valdés, Kelly, Sifre, Griggs & Ruiz Suria, a una reunión con la Lcda. Lidia González, donde se le mostró un documento relativo al plan de pensiones que, entre otras cosas, según el recurrido, le prohibía trabajar en el área de cosméticos por las próximos cinco años. Se negó copia de dicho documento al recurrido. Éste se negó a firmarlo.

Al no aceptar el plan de retiro propuesto, las recurrentes retiraron su oferta y cesantearon de inmediato al recurrido

el 17 de agosto. Dicen las recurrentes que deseaban que el señor Odriozola dejara de desempeñarse como Gerente General de Superior debido a sus ejecutorias deficientes, a pesar de que la situación económica de la compañía estaba mejorando y que siete meses antes habían premiado al recurrido por su gran labor. El demandante recurrido, por su parte, expresa que su despido se debió a su edad. Señala, además, que fue sustituido por una persona mucho más joven que él. (¹)

A la fecha de su despido, el recurrido recibía una compensación anual de $55,204.11. La misma se componía de un sueldo de $41,000 anuales y beneficios marginales valorados en $14,204.11 al año. Estos beneficios incluían un automóvil proporcionado por la compañía para uso personal y la aportación patronal al plan de retiro, entre otros.

Luego de ser cesanteado, el recurrido buscó empleo. Por razones obvias, no encontró un trabajo de igual categoría al que antes desempeñaba. Lo que más recibió fueron unos breves empleos de vendedor en 1980, por los que devengó un total de $3,600.

El despido produjo un estado mental algo alterado al recurrido. Testificó que acudió a su médico particular porque se sentía deprimido y padecía de insomnio. El 17 de septiembre de 1979 acudió al Fondo del Seguro del Estado para continuar su tratamiento, pues no podía seguir pagando su propio médico dada la súbita pérdida de ingresos en su hogar. (²) El

---

(¹) Dicha persona no pudo ser mantenida mucho tiempo en el puesto y fue despedida por supuestas fallas incurridas en el desempeño de sus deberes.

(²) Las recurrentes cuestionan que ésta fuera la razón que tenía el recurrido para ir al Fondo. Sin embargo, de la prueba surge que el recurrido fue al Fondo del Seguro del Estado a recibir tratamiento porque, ante la súbita pérdida de ingresos, acudir a un médico privado, como había venido haciendo, le resultaba muy oneroso. Así lo testificó el propio recurrido:

"Ledo. Moreda:

"P. Señor Odriozola, ¿usted dijo que acudió a su médico, quién es su médico?

"R. El Doctor Juan M. Aguiló Zambrana.

Fondo diagnosticó la condición del recurrido como una neurosis depresiva de leve a moderada y una ansiedad severa con rasgos depresivos. Dictaminó que el demandante era entonces un hombre con fases de angustia y expectación, desmoralizado, con sentimientos de menosvalía, desesperado e inconforme con su situación de desempleo.

El recurrido estuvo bajo tratamiento en descanso por el Fondo desde que se reportó, mediante declaración voluntaria, el 17 de septiembre de 1979, hasta que lo dieron de alta el 12 de marzo de 1980. Posteriormente tuvo un segundo período de tratamiento en descanso con el Fondo desde marzo hasta septiembre de 1981, debido a una recaída de su condición emocional.

En abril de 1982 fue dado de alta del tratamiento psiquiátrico en el Fondo con una incapacidad de 5% en sus funciones fisiológicas. El Fondo declaró que existía relación causal entre la enfermedad y la incapacidad resultante del recurrido y el despido sufrido. Dictaminó que ésta era una condición compensable bajo la Ley de Compensaciones a Obreros y le pagó al recurrido $1,080 en dietas y $1,028 por la incapacidad declarada.

■  El 19 de mayo de 1981 el recurrido y su esposa instaron la demanda que es objeto del pleito y la sentencia que aquí

---

.   .   .   .   .   .   .   .   .

"P. ¿Y qué hizo usted con el doctor Aguiló Zambrana, qué ocurre allí?

"R. El doctor me encontró en unas condiciones que me mandó a un siquiatra.

"P. ¿Usted recuerda donde qué siquiatra lo enviaron?

"R. Al doctor Rapale.

.   .   .   .   .   .   .   .

"P. ¿Cuánto tiempo estuvo usted con el doctor ... ?

"R. Estuve muy poco tiempo, porque cada vez que le veía la cara al doctor eran veinticinco dólares.

"P. ¿Y qué hizo luego?

"R. Bueno, pues luego fui al Fondo del Seguro y pedí ayuda y me la dieron." (E.N.P., 3/30/82, págs. 56–58.)

De la prueba desfilada no surge otra razón.

nos ocupan. (³) El tribunal sentenciador determinó como cuestión de hecho que el demandante fue despedido por razón de su edad. Concluyó que ello se hizo en violación del Art. 1 de la citada Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146) (⁴) y condenó a los demandados a indemnizar solidariamente al demandante con la cantidad de $227,045, más una suma igual, según dispuesto en dicho artículo, para un total de $454,090.

## II

*Aspecto de solidaridad*

Superior y Germaine son corporaciones distintas, con personalidad propia cada una de ellas. Superior es una corporación organizada bajo las leyes del Estado Libre Asociado, con oficina principal en Carolina, Puerto Rico. Germaine es una corporación organizada bajo las leyes de Delaware, con sede

---

(³) La causa de acción de la codemandante Gaudencia P. Odriozola fue desestimada por el Tribunal Superior porque no testificó acerca de los daños sufridos como consecuencia del despido de su esposo. No se nos solicitó que revisáramos esa determinación.

(⁴) Dispone así:

"Todo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su status como empleado, por razón de edad, según ésta se define más adelante, raza, color, sexo, origen social o nacional, condición social, ideas políticas o religiosas del empleado o solicitante de empleo: (a) incurrirá en responsabilidad civil (1) por una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo; (2) o por una suma no menor de cien (100) dólares ni mayor de mil (1,000) dólares, a discreción del tribunal, si no se pudieren determinar daños pecuniarios; (3) o el doble de la cantidad de los daños ocasionados si ésta fuere inferior a la suma de cien (100) dólares, y (b) incurrirá, además, en un delito menos grave y, convicto que fuere, será castigado con multa no menor de cien (100) dólares ni mayor de quinientos (500) dólares, o cárcel por un término no menor de treinta (30) días ni mayor de noventa (90) días, o ambas penas, a discreción del tribunal.

"El tribunal en la sentencia que dicte en acciones civiles interpuestas bajo las precedentes disposiciones podrá ordenar al patrono que reponga en su empleo al trabajador y que cese y desista del acto de que se trate."

principal de negocios en la ciudad de Nueva York. Ambas corporaciones son subsidiarias de la British American Cosmetics, que pertenece a su vez a la British American Tobacco Corporation. Superior se dedica a vender y distribuir en Puerto Rico los productos de belleza fabricados por Germaine y las fragancias marca Rochas.

Mientras trabajó por doce años como Gerente General y Vicepresidente de Superior, hasta que fue despedido en agosto de 1979, el recurrido respondía directamente al Vicepresidente de la División Internacional de Germaine. Este último era el encargado de determinar el sueldo y los bonos que recibiría el primero.

El demandante recurrido sostiene que dados los hechos que rodearon su despido y la estrecha relación existente entre Superior y Germaine, ambas le son responsables bajo la definición de patrono que contiene el Art. 6 de la citada Ley Núm. 100 (29 L.P.R.A. sec. 151 (2) ), a saber:

§ 151. —Definiciones
Los siguientes términos, según se emplean en las secs. 146 a 151 de este título, tendrán el siguiente significado:

.  .  .  .  .  .  .  .  .

(2) "Patrono" incluye a toda persona natural o jurídica que emplee obreros, trabajadores o empleados, y al jefe, funcionario, gerente, oficial, gestor, administrador, superintendente, capataz, mayordomo, agente o representante de dicha persona natural o jurídica. Incluirá aquellas agencias o instrumentalidades del Gobierno de Puerto Rico que operen como negocios o empresas privadas.

Por su parte, las recurrentes argumentan que, teniendo personalidad propia cada una, no puede adscribírsele indiferentemente a ambas el carácter de patrono, y que solamente Superior era el patrono del recurrido.

Ciertamente, ambas corporaciones son distintas personas jurídicas. Sin embargo, la prueba demuestra que el despido del recurrido fue efectuado por Germaine en sus oficinas de Nueva York. Era también Germaine quien supervisaba al re-

currido, y determinaba su salario, bonos y beneficios marginales. Germaine administraba el plan de pensiones al que estaban adscritos los empleados de Superior, incluso el recurrido. Entre las funciones del recurrido estaba hacer recomendaciones a Germaine en cuanto a ventas y promociones. Los ejecutivos de Germaine establecían el presupuesto y el plan de trabajo de Superior.

Bajo la Ley Federal contra el Discrimen en el Empleo (ADEA), 29 U.S.C. sec. 621 y ss., Germaine y Superior serían consideradas como una sola entidad, *Linskey* v. *Heidelberg Eastern, Inc.*, 470 F. Supp. 1181, 1183–1184 (E.D.N.Y. 1979), pues (1) sus operaciones están interrelacionadas; (2) el personal gerencial es común a ambas corporaciones; (3) existe un control conjunto de las relaciones laborales, y (4) una relación propietaria o control financiero conjunto. Íd., pág. 1184. *Marshall* v. *Arlene Knitwear, Inc.*, 454 F. Supp. 715, 719 (E.D.N.Y. 1978).

En la alternativa, se ha resuelto que bajo la misma ley federal, la corporación matriz responde si controla a su subsidiaria en un grado tal que convierte a esta última en agente o instrumento de la primera, *Linskey* v. *Heidelberg Eastern, Inc.*, ante, pág. 1184; *Woodford* v. *Kinney Shoe Corporation*, 369 F. Supp. 911, 916–917 (N.D. Ga. 1973), y si al no descartarse la dualidad de personalidades jurídicas entre ambas corporaciones (1) se ayudaría a la corporación subsidiaria a perpetrar un fraude o un daño, como por ejemplo, una violación de ley, y (2) si de eximirse de responsabilidad a la corporación matriz, el reclamante sufriría un daño o una "pérdida injusta". *Berkowitz* v. *Allied Stores of Penn-Ohio, Inc.*, 541 F. Supp. 1209, 1214 (E.D. Pa. 1982).

Ambos modos de visualizar la relación de corporación-patrono aplican también bajo la Ley Federal de Derechos Civiles, Tít. VII, 42 U.S.C. sec. 2000e; *Baker* v. *Stuart Broadcasting Co.*, 560 F.2d 389 (8th Cir. 1977); *cf.* 29 U.S.C. 630 (b) con 42 U.S.C. sec. 2000e-2 (a) (1).

No vemos razón alguna por la cual no deba adoptarse en casos bajo la Ley Núm. 100 esta norma aplicable bajo la *Age Discrimination in Employment Act* (ADEA). Germaine hacía algo más que proveer un plan de pensiones al recurrido. *Cf. Sobelman* v. *Commerce Bancshares, Inc.*, 444 F. Supp. 84, 85 (E.D. Mo. 1977). El hecho aislado de que una corporación principal establezca un plan de pensiones para los empleados de una corporación subsidiaria por sí solo no hace patrono, para propósitos de la ADEA, a la corporación principal. Aquí la situación era distinta, pues para todos los efectos prácticos, Germaine administraba a Superior. Ya se considere a ambas corporaciones como una sola entidad a efectos de la Ley Núm. 100, o a Superior como agente de Germaine, ambas son patronos del recurrido en cuanto a esta acción bajo la Ley Núm. 100 respecta. (5) Compárese el Art. 6(2) de la Ley Núm. 100 (29 L.P.R.A. 151(2)) con la Sec. 11(b) de la ADEA, 29 U.S.C. sec. 630(b). Ambas incluyen al agente como patrono. Véase *Berkowitz* v. *Allied Stores of Penn–Ohio, Inc.*, ante, págs. 1213–1215. Germaine era propietaria de Superior (E.N.P., 5/20/82, pág. 22), controlaba sus operaciones e inclusive, fundó a Superior.

Mantener la dualidad de personalidades de ambas corporaciones frustraría la política pública de la Ley Núm. 100, pues sería muy fácil para una corporación matriz discriminar contra un empleado de su corporación subsidiaria y luego argumentar que, por no ser patrono del empleado perjudicado, no

---

(5) Esta conclusión aplica exclusivamente bajo la Ley Núm. 100. No es necesario resolver si la misma conclusión se impone bajo nuestro Derecho general de corporaciones. Véanse *González* v. *San Just Corp.*, 101 D.P.R. 168, 172 (1973); *Escude Cruz* v. *Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905–906 (1st Cir. 1980). Las partes no plantearon la controversia en esos términos. Cuando "la cuestión no ha sido suficientemente debatida por las partes ni su resolución es necesaria para decidir el recurso, no entraremos en el estudio detenido de la misma". *Municipio* v. *Ríos*, 61 D.P.R. 102, 114 (1942). No es éste un caso en que la justicia requiera que entremos a discutir esta cuestión. *Cf. Ab Intestato Marini Pabón*, 107 D.P.R. 433, 439–440 (1978).

responde bajo la Ley Núm. 100. La ley pretende que el verdadero responsable del discrimen sea quien responda por su actuación. Bajo las circunstancias aquí presentes, es inescapable concluir que tanto Germaine como Superior eran patronos del señor Odriozola bajo la citada Ley Núm. 100, y que su responsabilidad para con él es solidaria.

## III

*Inmunidad bajo la Ley de Compensaciones por Accidentes del Trabajo*

■ Se argumenta que siendo el señor Odriozola un empleado favorecido por la Ley de Compensaciones por Accidentes del Trabajo, no tiene causa de acción contra su patrono en virtud de la inmunidad que al patrono concede dicha ley en su Art. 20 (11 L.P.R.A. sec. 21). En este caso Superior era patrono asegurado bajo la referida ley. Germaine no lo era. Pero siendo él empleado de ambas, la inmunidad patronal que cobija a Superior alcanzaría también a Germaine. Véase *Williams* v. *McAllister Bros. Inc.*, 534 F.2d 19, 22 (2nd Cir. 1976).

El recurrido recibió $1,080 en dietas y $1,028 por incapacidad de 5% de parte del Fondo del Seguro del Estado como compensación por la reacción de ansiedad que la noticia de su despido le produjo. Las recurrentes sostienen que la decisión del Fondo referente a que el recurrido tenía una enfermedad ocupacional compensable pone en vigor la inmunidad patronal en este caso. Argumentan que ello las exime de responsabilidad bajo la Ley Núm. 100, (⁶) y en la alternativa, las exime de tener que compensar al recurrido por concepto de paga atrasada correspondiente a los períodos en que éste fue com-

---

(⁶) Este argumento ya fue presentado anteriormente ante este Tribunal, pero fue declarado no ha lugar en aquella etapa anterior de los procedimientos. Resolución de 14 de enero de 1982, enmendada *nunc pro tunc* el 11 de febrero de 1982. El mismo está ahora listo para ser resuelto.

pensado por el Fondo y de la penalidad de doble daño que establece el Art. 1 de la Ley Núm. 100, según enmendado, 29 L.P.R.A. sec. 146. Alegan también que están exentos de responsabilidad en cuanto a los ingresos futuros dejados de percibir por el demandante recurrido.

En otras jurisdicciones, cuando se ha opuesto la defensa de exclusividad del remedio de compensación a una acción por discrimen en el empleo, los resultados han variado a tenor con los daños que se reclaman, las circunstancias del caso y la ley invocada para dar jurisdicción sobre la materia al tribunal.

Como regla general, se ha determinado que cuando la esencia de la reclamación es un daño físico, la cláusula de exclusividad de remedios de la Ley de Compensación opera, e impide una acción judicial en que se reclame por la misma lesión. Esto incluye daños emocionales. *Stimson v. Michigan Bell Tel. Co.*, 258 N.W.2d 227, 230–232 (Mich. Ct. App. 1977). Si el grueso de la reclamación judicial, sin embargo, no se refiere a una lesión física, siendo añadido el daño físico como "lastre" a la demanda, entonces la inmunidad patronal no entra en vigor, permitiéndose la acción judicial. Íd., pág. 232; *Rentería v. County of Orange*, 147 Cal. Rptr. 447, 452 (Cal. Ct. App. 1978); 2A *Larson, Workmen's Compensation Law*, Secs. 68.34(a) y (d), págs. 13-57 a la 13-63 y 13-76 a la 13-78 (1983).

Se ha dicho que la acción en daños contra el patrono por intencionalmente haber causado angustias mentales a su empleado no es una lesión de carácter físico, por lo que no cae bajo el ámbito de la Ley de Compensaciones a Obreros. Por lo tanto, el patrono no podrá oponer con éxito la exclusividad de remedios que la ley provee. 2A *Larson, op. cit.*, Sec. 68.34(a). Véase *Cohen v. Lion Products Company*, 177 F. Supp. 486 (D. Mass. 1959). Lo mismo se ha dicho de la acción judicial que el empleado insta contra su patrono por discrimen. *Stimson v. Michigan Bell Tel. Co.*, ante, pág. 231.

Pero también se ha sostenido que si esas acciones patro-

nales culminan en un daño físico que incapacita al obrero para trabajar, entonces la lesión es compensable, y la cláusula de exclusividad de remedios entra en vigor. *Stimson* v. *Michigan Bell Tel. Co.*, ante, pág. 232; *Renteria* v. *County of Orange*, ante, págs. 451–452. En este último caso, el patrono tuvo que responder en corte por las angustias mentales que intencionalmente causó a su empleado. Es de notarse que, a pesar de que fue despedido, el empleado no resultó incapacitado.

Esta conclusión fue subrayada en *Freeman* v. *Kelvinator, Inc.*, 469 F. Supp. 999 (E.D. Mich. 1979), y en *Moll* v. *Parkside Livonia Credit Union*, 525 F. Supp. 786, 788–790 (E.D. Mich. 1981).

No obstante, el propio Tribunal de Apelaciones de Michigan que creó en *Stimson* v. *Michigan Bell Tel. Co.*, supra, la norma antes expuesta, expresó posteriormente lo siguiente, en lo que constituyó un cambio doctrinal:

> We can find no logic in holding that the bureau is the proper forum for recovering compensation when discriminatory employment tactics cause emotional injuries which culminate in disability but that the circuit court is the appropriate forum when the same discriminatory conduct does not cause physical disability. In either case, the alleged *cause* of the injuries stemmed from the same source: intentional employment discrimination. This is the very conduct the FEPA [Fair Employment Practices Act] was designed to protect against. It is *not* the type of conduct the WDCA [Worker's Disability Compensation Act] was designed to protect against. To hold otherwise, would cancel two remedial statutes. *Freeman, supra,* 1004. *Pacheco* v. *Clifton,* 311 N.W.2d 801, 806 (Mich. Ct. App. 1981).

El mismo enfoque, que excluye de la Ley de Compensación las acciones intencionales que causan daño al obrero, fue utilizado en *Moore* v. *Federal Department Stores, Inc.*, 190 N.W.2d 262 (Mich. Ct. App. 1971), que trataba de un incidente de detención ilegal.

■ En Puerto Rico, nuestra Ley de Compensaciones por Accidentes del Trabajo no aplica a lesiones del obrero producidas intencionalmente por el patrono. En *Alonso García* v. *Comisión Industrial,* 102 D.P.R. 689, 695–699 (1974), señalamos que no había diferencia bajo la ley entre un "accidente" y una "enfermedad". Ambas son compensables siempre y cuando se trate de "una lesión *inherente al trabajo o empleo concernido o que ocurra o se agrave en el curso de éste".* (Énfasis en el original.) Íd., pág. 699. "El vocablo 'lesión' se ha ampliado igualmente para incluir no sólo daños físicos sino emocionales." Íd., pág. 696. El problema se reduce a probar la relación entre la lesión y el empleo.

■ Es compensable una lesión que "(1) provenga de cualquier acto o función del obrero; (2) sea inherente al trabajo o empleo del obrero; y (3) ocurra en el curso de éste". *Admor., F.S.E.* v. *Comisión Industrial,* 101 D.P.R. 56, 58 (1973). No puede alegarse seriamente que una práctica discriminatoria sea inherente al empleo. Tampoco proviene de un acto del obrero, sino de una actuación del patrono, independientemente de que ocurra o no un daño físico. Tan ajeno al trabajo es el discrimen que se ha creado en Puerto Rico una ley especial para castigarlo: la Ley Núm. 100. Al no ser compensables los daños producidos por el discrimen alegadamente cometido, no entra en vigor en este caso la exclusividad de remedios que ordena la Ley de Compensaciones por Accidentes del Trabajo. Resolver lo contrario sería anular el efecto de la Ley Núm. 100 sobre los patronos asegurados. No fue eso lo que el legislador tuvo en mente.

■ Resolvemos que los daños sufridos por un empleado debido a discrimen en su contra en el empleo no son compensables bajo la Ley de Compensaciones por Accidentes del Trabajo. Siendo así, pueden ser reclamados ante los tribunales, aunque el Fondo del Seguro del Estado ya los haya compensado. En ese caso, el Fondo tendrá derecho a reclamar que el

obrero le devuelva el dinero que recibió. Además, dado que procede la reclamación bajo la Ley Núm. 100 en este tipo de casos, se aplica a los mismos la cláusula de doble daño de dicha ley.

IV

*Méritos del caso*

Pasemos a los méritos del caso en atención a los hechos probados.

■ El Art. 3 de la Ley Núm. 100 (29 L.P.R.A. sec. 148) establece expresamente una presunción de discrimen en ausencia de justa causa para el despido.[7] Dicho artículo dispone:

> Se presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de las secs. 146 a 151 de este título, cuando los mismos hayan sido realizados sin justa causa. Esta presunción será de carácter controvertible.

Establecida la presunción, corresponde al patrono demandado rebatirla estableciendo mediante preponderancia de la prueba que el despido no fue discriminatorio. En *Ibáñez* v. *Molinos de P. R., Inc.*, 114 D.P.R. 42 (1983), dijimos que el patrono debe probar que la existencia del discrimen es menos probable que su inexistencia.

En el caso de autos, Germaine y Superior no pudieron persuadir al juzgador de que el despido no fue discriminatorio. Adujeron, y pretendieron establecer mediante prueba documental y testimonial, que el recurrido no se desempeñaba eficientemente como Gerente General de Superior en los años previos al 1977.[8] Es innecesario que reseñemos una vez más

---

[7] Véase el Art. 2 de la Ley sobre Despidos Ilegales, 29 L.P.R.A. 185b, para un listado ilustrativo de lo que constituye justa causa para despedir a un empleado.

[8] *Cf.* con el inciso (b) del Art. 2 de la Ley sobre Despidos Ilegales, *supra*.

los detalles expuestos en la Parte I de esta opinión. Baste señalar que la responsabilidad por la baja en ventas para el 1977 pudo determinarse entonces y, de haberse despedido en aquella fecha al recurrido probablemente no estaríamos frente a un caso por discrimen por edad.

El recurrido fue puesto, si se quiere, a prueba, y se concibió y puso en práctica el plan de aumentos y bonificaciones salariales si se lograban superar las ventas del ejercicio fiscal 1976-1977. El recurrido sobrepasó con creces las expectativas logrando para el año 1977-1978 ventas netas que superaron un 18% las del año anterior. Por ello se le concedió el aumento de sueldo más grande que tuviera durante su relación de quince años con las empresas recurrentes. Su labor fue reconocida, además, el 4 de octubre de 1978, al expresarle por escrito: "[k]eep up the great work and congratulations on your excellent performance." Véase carta de Bentley T. Braffet, Director de Germaine para América Latina, dirigida al recurrido. Más aún, se amplió su área de responsabilidad haciéndola extensiva a Islas Vírgenes.

No podemos aceptar que en medio de esta tendencia ascendente de los negocios de las recurrentes, gracias al esfuerzo del señor Odriozola, se insistiera en su retiro menos de un año después y se le despidiera por no aceptarlo. La ausencia de justa causa quedó plenamente establecida y la presunción de discrimen por razón de su edad no fue rebatida por la prueba de las recurrentes. Así lo concluyó el tribunal de instancia. No hay base en la prueba para alterar su determinación. *Morán Simó* v. *Gracia Cristóbal*, 106 D.P.R. 155, 161 (1977).([9])

---

([9]) Argumentan las recurrentes que el tribunal no tomó en consideración el testimonio vertido por el Sr. Bernhard Guenther en una deposición que se le tomó. No nos persuaden. Lo que surge de la prueba es que el tribunal no le dio crédito, habiéndole merecido más credibilidad el testimonio del demandante recurrido. No estamos autorizados a intervenir con su apreciación. *Tosado* v. *Morell*, 70 D.P.R. 83, 85 (1949).

## V

*Aspecto de los daños*

Las cuantías concedidas en la sentencia que nos ocupa han sido objeto de impugnación por las recurrentes. Al determinar su monto, el Tribunal Superior sentó la siguiente base:

> Los daños causados al demandante por el acto discriminatorio del despido incluyen la pérdida económica acaecida, así como la que necesariamente y con toda probabilidad sufrirá hasta por lo menos la edad de 65 años y los sufrimientos y angustias mentales desarrolladas en ocasión del acto discriminatorio. (Conclusiones de Derecho, Núm. 17.)

El tribunal estimó la pérdida económica a base de los ingresos y beneficios que el demandante dejó de percibir desde la fecha del despido hasta la fecha de la sentencia, descontando los ingresos que durante ese período el demandante obtuvo de otros empleos. Determinó que el demandante recibía una compensación anual montante a $55,204.11, que desde el despido hasta la sentencia transcurrieron tres años y seis meses, y que durante ese tiempo derivó de diferentes empleos la cantidad de $3,600. Un sencillo cálculo matemático nos eleva a la cifra de $189,614.38, que fue la concedida por ese concepto.

De esa partida las recurrentes cuestionan que se incluyera en la compensación anual su aportación al plan de pensiones, que se estimó en $7,885.74 anuales, y los beneficios marginales por concepto de seguro de vida e incapacidad, plan médico y automóvil. Reclaman además que el demandante no mitigó los daños. Veamos esto por separado.

█ La prueba de las recurrentes en cuanto a la cantidad por plan de pensiones fue poco convincente. Su perito, Sr. Thomas Mitchell, actuario de C. G. Thatcher & Associates, consultores del plan de pensiones de Germaine, no pudo precisar cuánto aportó la compañía al plan de pensiones en 1978. Expresó que "adivinaría" que para 1979 la aportación del re-

currido fue de aproximadamente cinco por ciento de su salario. Estas imprecisiones condujeron al tribunal a tomar como cierta la suma específica y no especulativa que ofreció quien fuera administrador del plan de pensiones mientras el recurrido trabajó para la recurrente. La prueba sobre los otros beneficios marginales y su cuantía fue aportada por las propias recurrentes. No hallamos base para alterar la determinación hecha al respecto. Cabe señalar que en la jurisdicción federal se ha reconocido, al aplicar la Ley Contra el Discrimen por Edad en el Empleo (ADEA), que los beneficios marginales dejados de recibir son compensables como ingreso no devengado. Eso incluye la partida por el automóvil que se proveía al recurrido. Véase *Loubrido* v. *Hull Dobbs Co. of Puerto Rico, Inc.*, 526 F. Supp. 1055, 1059–1060 (Dist. Ct. P.R. 1981). No hay base para establecer diferencia, a este respecto, en la aplicación de la Ley Núm. 100.

Las recurrentes proponen que se descuente a la cantidad total concedida por los conceptos expresados ($189,614.38) la cantidad correspondiente a los períodos en que el demandante estuvo en descanso por indicación médica debido a la ansiedad que el despido ilegal realizado por las demandadas le causó. Alegan que no pueden compensarse los ingresos por salarios dejados de recibir durante un período de tiempo en el que el demandante no podía trabajar. No podemos acceder a semejante petición. Si el recurrido no podía trabajar, era porque estaba enfermo, y esa enfermedad se debía a la acción de las recurrentes al discriminar en su contra. Hace tres cuartos de siglo hicimos claro que las consecuencias probables del daño causado constituyen un elemento integrante de los daños reclamados. *E.g.*, *Ramírez* v. *The A. R. R. Co. of P. R.*, 17 D.P.R. 464, 468 (1911). En múltiples ocasiones hemos compensado los ingresos dejados de devengar por una persona que muere debido a un acto de otra persona. Sería irrisorio negar dicha compensación a base de que los muertos no trabajan. *E.g.*, *Sánchez* v. *Liberty Mutual Ins.*

*Co.*, 100 D.P.R. 1 (1971); *Vda. de Seraballs* v. *Abella Hernández*, 96 D.P.R. 368 (1964).

■ El planteamiento sobre no mitigación de daños es también inmeritorio. Cabe apuntar que este planteamiento no fue hecho al formular alegación respondiente. Como defensa afirmativa, debió presentarse entonces. Regla 6.3 de Procedimiento Civil; *Wright & Miller, Federal Practice and Procedure: Civil*, Sec. 1273 (1969). Defensas como esta, si no se promueven en la contestación, se tienen por renunciadas. Regla 6.4 de Procedimiento Civil; *Wright & Miller, op. cit.*, Sec. 1278. Empero, habiendo sido objeto de prueba, consideramos que dicha defensa quedó incorporada a las alegaciones de las recurrentes por enmienda implícita a las mismas. Regla 13.2 de Procedimiento Civil.

■ El demandante estaba obligado a emplear todos los medios razonables a su alcance para reducir el monto de sus daños. *Fresh-O-Baking Co.* v. *Molinos de P.R.*, 103 D.P.R. 509, 520 (1975). En varios casos de despido ilegal bajo diversas leyes federales se ha resuelto que lo que razonablemente se requiere del empleado despedido es que esté disponible para trabajar y busque remedio a su situación en todos los foros disponibles. *Urbina* v. *United States*, 428 F.2d 1280, 1287 (U.S. Ct. Cl. 1970); *White* v. *Bloomberg*, 360 F. Supp. 58, 62 (D. Md. 1973), confirmado en 501 F.2d 1379 (4th Cir. 1974). La persona puede valerse de sus contactos personales, y no es necesario que su búsqueda de empleo sea hecha a través de anuncios clasificados y de someter solicitudes de empleo en todas las agencias y compañías relacionadas con el campo en que el empleado despedido trabajaba. *E. E. O.* v. *Kallir, Phillips, Ross, Inc.*, 420 F. Supp. 919, 925 (S.D.N.Y. 1976). Basta que el ex empleado haga un esfuerzo razonable para conseguir empleo. El mismo no tiene que ser de una categoría o tipo inferior al trabajo anterior. Íd., pág. 925. Corresponde al patrono demandado demostrar no solamente que su ex em-

pleado no fue razonablemente diligente en su búsqueda de empleo, sino también que de haberlo sido hubiera encontrado empleo disponible y hubiera así obtenido ingresos. Íd., pág. 926.

Debido a la similitud de propósitos entre las leyes federales bajo las cuales se decidieron esos casos y nuestra Ley Núm. 100, adoptamos hoy los criterios arriba apuntados. Así pues, concluimos que el recurrido mitigó sus daños dentro de lo razonablemente posible.

Luego de su despido, el señor Odriozola buscó empleo activamente, valiéndose de los contactos que por sus quince años en la industria de cosméticos logró establecer. En marzo de 1980 consiguió trabajo como vendedor de ropa con Menéndez & Sons. Trabajó allí durante cuatro meses, recibiendo una comisión ascendente a $600. Los restantes seis meses del año, estuvo empleado en Ronie, Inc., una empresa de ropa de maternidad. Su sueldo era de $500 mensuales. El sueldo total que el recurrido devengó en ambos empleos fue de $3,600. Esta cantidad es sustancialmente menor que la de $41,000 en sueldos, más $14,204.11 en beneficios marginales que el recurrido recibía como Gerente General y Vicepresidente de Superior.

■ Bajo la Ley Federal contra el Discrimen por Edad en el Empleo (ADEA), algunos tribunales han resuelto que cualquier remuneración recibida por el empleado injustamente despedido entre la fecha en que ocurrió el despido y la fecha del juicio debe ser descontada de la cantidad otorgada por el tribunal solamente en la medida en que esa cantidad exceda aquella que el ex empleado hubiera recibido de haber permanecido empleado por su patrono anterior durante ese período. *Laugesen* v. *Anaconda Company*, 510 F.2d 307, 317–318 (9th Cir. 1975). En el caso del señor Odriozola, es claro que lo que éste devengó ni siquiera se aproxima a lo que hubiera devengado de haber sido retenido en su empleo. No obstante, resulta innecesario expresarnos sobre la aplicación bajo la Ley Núm. 100 de la norma de *Laugesen* v. *Anaconda Com-*

*pany*, supra. El Tribunal Superior descontó de la suma concedida por concepto de daños los $3,600 devengados por el demandado en sus empleos posteriores, y el demandante no impugnó esa determinación ante nosotros. Siendo así, se mantiene vigente esa porción de la sentencia.

■ No es necesario descontar cantidad adicional alguna por falta de mitigación de daños. El recurrido ya ha cumplido los 65 años de edad, y aunque ha buscado un trabajo comparable al que antes tenía, no ha podido hallarlo, pues sus posibilidades para ello son mínimas. Además, el recurrido no sólo realizó esfuerzos suficientes para buscar ingresos, sino que también se sometió voluntariamente a tratamiento médico para evitar que fueran mayores sus daños emocionales, los que de paso no le fueron compensados por el tribunal a quo. ([10]) No puede exigírsele que hiciera algo más.

En cuanto a la pérdida futura, es decir, pérdida de ingresos desde la fecha de la sentencia hasta que el demandante cumpliera 65 años de edad, el tribunal estimó su valor en $57,915.08. A esa suma descontó lo que el demandante pudiera devengar como ingresos a base de su probabilidad de conseguir empleo durante dicho período restante. Para hacer el cómputo, el tribunal utilizó las estadísticas del Departamento del Trabajo y Recursos Humanos referentes a la probabilidad de obtener empleo de las personas entre 60 y 64 años de edad. De esta suerte, le restó el .3537 de probabilidad de empleo, y restó a la suma anterior $20,484.56, para una pérdida neta de ingresos futuros ascendente a $37,430.52. Sumada esta cantidad a los $189,614.38 estimados como pér-

---

([10]) *Quaere* si bajo la Ley Núm. 100 son compensables los daños emocionales que un despido discriminatorio causare al empleado. No lo son bajo la Ley Federal contra el Discrimen por Edad en el Empleo. *E.g., Walker* v. *Pettit Const. Co., Inc.*, 605 F.2d 128, 129–130 (4th Cir. 1979), en reconsideración *R. Firth* v. *Eastern Air Lines, Inc.*, 611 F.2d 950 (4th Cir. 1979); *Rodríguez* v. *Taylor*, 569 F.2d 1231, 1241 (3rd Cir. 1977), *cert.* denegado 436 U.S. 913 (1978).

dida de ingresos sufridos hasta la fecha de la sentencia arrojan un total de $227,044, cantidad a que ascienden los daños. A ello se suma una cantidad igual por disposición de la ley.

La compensabilidad de daños por pérdida de ingresos futuros, conocidos como *front pay* bajo la Ley contra el Discrimen por Edad en el Empleo (ADEA) federal, ha tenido hasta aquí remedios un tanto disímiles. Una mayoría de los Tribunales de Circuito se pronuncia a favor de su concesión. De hecho, solamente el Primer Circuito se ha pronunciado en contra, y lo hizo en un escolio, sin más explicaciones, en *Kolb* v. *Goldring, Inc.*, 694 F.2d 869, 874–875, n. 4 (1st Cir. 1982). En el mismo año el Noveno Circuito se pronunció a favor. *Cancellier* v. *Federated Dept. Stores*, 672 F.2d 1312 (9th Cir. 1982), *cert.* denegado en 459 U.S. 859 (1982). Igualmente lo hizo el Octavo Circuito en *Gibson* v. *Mohawk Rubber Co.*, 695 F.2d 1093 (8th Cir. 1982). Expresó que "[e]l remedio equitativo que la corte de distrito puede conceder incluye, *inter alia*, beneficios adicionales por pensiones, reinstalación, y daños pecuniarios en sustitución de reinstalación", y que la corte "debe presumir, en ausencia de prueba en contrario, que el empleado despedido ilegalmente hubiese continuado trabajando para su patrono hasta alcanzar la edad normal de retiro". Págs. 1100–1101 y n. 8.([11])

Más recientemente, el 22 de agosto de 1984, en una razonada opinión, el Segundo Circuito resolvió que bajo el citado estatuto federal, el empleado despedido discriminatoriamente por edad tiene derecho a que se le compense por ingresos futuros que pudiera devengar hasta la edad del retiro. *Whittlesey* v. *Union Carbide Corp.*, 742 F.2d 724 (2nd Cir. 1984). Al mismo resultado es forzoso llegar bajo la Ley Núm. 100.

Razonamos, al igual que el Segundo Circuito, que al igual que la ADEA, nuestra Ley Núm. 100 no distingue ni establece

---

([11]) Conforme lo hizo constar el Tribunal Superior, el señor Odriozola manifestó que de haber permanecido en el empleo se habría retirado probablemente a los 65 años.

limitación alguna al concepto de daños al no poderse decretar la reinstalación del empleado a su puesto, sea porque, como en *Whittlesey* v. *Union Carbide Corp.*, supra, el antagonismo entre el patrono y el empleado hubiere impedido su reinstalación, o, como en el caso ante nos, ya el empleado ha pasado de la edad de 65 años, que es la máxima de cobertura bajo nuestra ley.[12] Los ingresos futuros calculados hasta la edad de retiro son una parte indispensable de la justa compensación a que el empleado discriminado por edad tiene derecho.

■ La razón principal esgrimida contra dicha partida de daños es que resulta especulativa. Concedemos que siempre hay un tanto de especulación cuando se trata de determinar pérdida futura. Pero ello no puede derrotar el derecho a que se compense por esa pérdida. Nuestros tribunales constantemente están determinando pérdida de ingresos futuros como parte de la indemnización a que tiene derecho la persona que sufre daños por culpa o negligencia de otro. Jurisprudencialmente se han elaborado normas para fijar parámetros al hacerse la determinación de su cuantía. *Cf. Ruiz Santiago* v. *E.L.A.*, 116 D.P.R. 306 (1985).[13]

## VI

En atención a los fundamentos consignados en esta opinión, *la sentencia del Tribunal Superior será confirmada.*

---

[12] Véase el Art. 6 (29 L.P.R.A. sec. 151(1)).

[13] No nos expresamos sobre la procedencia de los descuentos hechos por el tribunal de instancia al hacer el cálculo de pérdida futura, por no haber sido objeto de impugnación por las partes. De hecho, dichos descuentos fueron sugeridos por el propio demandante, y es a él a quien afectan.

Tampoco nos expresamos sobre el derecho a compensación por sufrimientos y angustias mentales sufridos por el demandante recurrido. El tribunal sentenciador consideró innecesario adjudicar cantidad alguna por ese concepto, por estimar que ello quedó debidamente compensado en las partidas por pérdida de ingresos, aparte de por la disposición de ley que obliga a conceder una suma igual a la estimada como daños sufridos, como penalidad. Esta determinación por parte del tribunal de instancia no ha sido objeto de impugnación en el presente recurso.

*Deberá notificarse al Administrador del Fondo del Seguro del Estado para que proceda a gestionar el reembolso de las cantidades pagadas al demandante recurrido.*